IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHEILA JOHNSON,                              )
                                             )
                          Plaintiff,         )
                                             )
            v.                               )        Civil Action No. 05-0867
                                             )
COMMUNITY COLLEGE OF                         )
OF ALLEGHENY COUNTY, et al.                  )
                                             )
                          Defendants.        )


MEMORANDUM OPINION

In this memorandum opinion, the court considers the motion for summary judgment filed

by defendants Community College of Allegheny County ("CCAC" or "college"), Charles

Blocksidge ("Blocksidge"), Nancilee Burzachechi ("Burzachechi"), and Jeanne Shader

("Shader", together with CCAC, Blocksidge and Burzachechi collectively referred to as

"defendants"), with respect to all claims asserted by plaintiff Sheila Johnson ("Johnson" or

"plaintiff") under Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C.

§§ 2000e *et seq.*; 42 U.S.C. §§  1981, 1983; Pennsylvania Human Relations Act ("PHRA"), 43

Pa. Cons. Stat. § 954(b); section 601 of Title VI of the Civil Rights Act of 1964 ("Title VI"),

42 U.S.C. § 2000d; Family and Medical Leave Act of 1993, as amended ("FMLA"), 29 U.S.C.

§2601 *et seq.*; and Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201.  After

considering defendants' motion for summary judgment, the joint statement of facts ("J.S.") and

the other submissions of the parties and viewing all disputed facts and drawing all reasonable

inferences in favor of plaintiff, the court will grant summary judgment in favor of defendants

with respect to plaintiff's claims under a) Title VII and the PHRA for race and gender discrimination, retaliation and hostile work environment, except for gender discrimination claims against CCAC relating to CCAC's failure to promote plaintiff to vice president; b) Title VI; c) the FMLA; and d) the ADA. With respect to plaintiff's Title VII and PHRA claims for gender discrimination relating to CCAC's failure to promote plaintiff to vice president, summary judgment is denied.

## FACTUAL BACKGROUND

In 1986, Johnson, an African-American female, began working at CCAC doing job training for local organizations, businesses, and corporations. (May 23, 2006 Deposition of Sheila Johnson ("Johnson Dep.") at 65.) From 1987 to 2001, Johnson held the following titles at CCAC: coordinator of counseling, coordinator of the adults in career transition, counselor/coordinator of the Women's Center Campus, coordinator of New Choices/New Options Program, associate professor of counseling, system-wide coordinator of New Choices/New Options, and professor of counseling. (Id. at 66-68, 73.) In 2001, Johnson became the acting director of contracts and grants and within a few months obtained the title of director of contracts and grants. (Id. at 68.) Johnson held this position until her termination on January 17, 2005. Johnson's employment with CCAC was not the primary purpose for the college's receipt of federal funds. (J.S. ¶170.)

As director of contracts and grants, Johnson's duties included distributing information on government grant availability and coordinating applications for government grants. (Defs.' Exs. 26, 59.) Johnson acted as a contact person with grant funders in an effort to obtain grants for

CCAC.  (Id.)  She worked with the accounting staff on fiscal audits, visited grant projects for pre-audit compliance, and assisted grant writers in their adherence to grant submission requirements.  (Id.)  Once a grant award was made, the responsibility for the grant's day-to-day operations shifted from Johnson to the grant's project director.  (Deposition of Charles Blocksidge ("Blocksidge Dep.") at 43.)  Johnson attended conferences in Harrisburg, Pennsylvania and Washington, D.C. to keep apprised of grant writing issues.  (Id.)

**Desired Positions**

Dr. Stewart Sutin ("Sutin") was president of CCAC from August 2003 through October 2006.  Shader was director of human resources at CCAC during the relevant time period.  By email dated April 11, 2003, Shader informed CCAC administrators, faculty, and staff that the college was seeking an interim vice president executive dean at the Allegheny campus.[1]  The email indicated that only internal regular CCAC employees would be considered for the position.  (Defs.' Ex. 7.)  The communication also stated that the interim position would only last for six months, and that the selected interim vice president would have the opportunity to apply for the vice president executive dean position if it was ever posted as a regular full-time position.  (Id.)

In response to this email, Johnson submitted her application for the interim vice president executive dean position.  (Defs.' Ex. 8.)  CCAC interviewed Johnson for the position, and she received an interview score of 173.  (J.S. ¶ 13; Defs.' Ex. 9.)  CCAC also interviewed Allysen Todd ("Todd") for the same position, and she received an interview score of 244.  (J.S. ¶ 13;

---

[1]  In her position as director of human resources, Shader was responsible for policies, procedures, and implementation at the college.  (J.S. ¶ 160.)

Defs.' Ex. 9a.) Todd is a Caucasian female, and CCAC eventually appointed her to the interim vice president executive dean position. (J.S. ¶ 13.)

On August 8, 2003, Johnson applied for the full-time regular vice president position at the Allegheny campus. (Defs.' Ex. 10.) In an email dated August 27, 2003, Erin Sheets, human resources administrator, notified Johnson that she was scheduled for a telephone interview with the search committee. (Defs.' Ex. 11.) After the telephone interview, CCAC selected an African-American male candidate, Brian Johnson, for the regular vice president position. (J.S. ¶ 15.)

On December 17, 2003, Dan Lowe ("Lowe") informed Sutin, Todd, Shader, and others that he intended to return to the faculty, thus vacating his position as dean of occupational technologies at the Allegheny campus. (Defs.' Ex. 30.) Later that same day, Lowe informed Johnson about his decision to resign as dean of occupational technologies. (Id.) In response to Lowe's email, Johnson informed Blocksidge and Sutin that "when there are discussions regarding this interim position and or [sic] when this permanent appointment is discussed, I would like to be reviewed as a viable candidate for this position." (Id.)

On January 8, 2004, Todd sent an email to all email users at CCAC's Allegheny campus, downtown center, and Homewood-Brushton center. (Defs.' Ex. 32.) In that email, Todd stated that because of a "short turn-around period," Todd had asked Anthony Lucas ("Lucas") to fill the position as interim academic dean of occupational technologies. (Id.) The next day, Johnson wrote a memorandum to Sutin, copying Blocksidge and Shader, which addressed the interim dean of occupational technologies position. (Defs.' Ex. 33.) In that memorandum, Johnson wrote:

I have concerns relative to the selection process and appointment regarding the Interim Dean of Occupational Technologies at Allegheny Campus. I have attached Dr. Todd's email announcing the appointment of Professor Anthony Lucas as the Interim Dean of Occupational Technologies at the Allegheny Campus. Also attached is my email requesting to be considered for the interim and or permanent appointment as Dean of Occupational Technologies at the Allegheny Campus. Although, I indicated my interest in the position the same day Mr. Lowe announced his return to the faculty, I was not contacted in any manner regarding the vacant Dean of Occupational Technologies search process. My concern stems from the recent history with the Vice President of Allegheny Campus Search process. Although my qualifications exceed the minimum qualifications for both positions, in both cases I was not contacted for an interview.

I have several questions, "[sic] Why was I not given the professional courtesy of an interview for the Interim Dean of Occupational Technologies position? Why was I not notified of the Dean of Occupational Technologies search process although I had expressed an interest in the position? Since the position was not posted externally or internally, what processes and procedures were used to identify and interview qualified candidates?

(Id.)

Todd's appointment of Lucas as interim dean of occupational technologies was an internal transfer. (Defs.' Ex. 87; J.S. ¶ 13.) CCAC's policy with respect to posting positions provided:

All position vacancy announcements must be posted internally at every College location for a minimum of ten work days. Postings may be waived by the President for administrative positions that are filled with internal transfers or granted funded employees.

(Defs.' Ex. 34.)

**Request for Job Upgrade/Reclassification**

In September 2003, Johnson requested an upgrade of her position. (Defs.' Ex. 16; Blocksidge Dep. Ex. 6.) This request was included in a proposed reorganization of the contracts

5

and grants department; the reorganization was one of Johnson's stated performance objectives. (Id.) Shader advised Johnson that Carol Voci ("Voci"), human resources administrator, would perform a job audit upon Johnson's request. (Defs.' Ex. 16.) On September 26, 2003, Sutin emailed Johnson, "I spoke with [Blocksidge] this morning. He will work with you and [Shader] on your job reclassification, and also on staffing and budget issues." (Defs.' Ex. 25.) During the process, Johnson found Blocksidge, Shader, and the human resources staff cooperative and indicated that they worked well together. (August 7, 2006 Deposition of Sheila Johnson ("Johnson Dep. vol. 2") at 308.)

On October 20, 2003, Shader recommended that Sutin approve the reclassification of Johnson's position, including an 8% salary increase, effective November 1, 2003. (Deposition of Stewart Sutin ("Sutin Dep.") Ex. 14.) Sutin signed the position reclassification form that day.[2] (Id.) Sutin signed the form under the belief that Blocksidge had approved the reclassification and that the position reclassification form should have included, which it did not, a space for Blocksidge to sign as well. (Sutin Dep. at 91-97.) Sutin routinely involved the management team in similar decisions and had incorrectly assumed that Blocksidge had previously approved Johnson's reclassification. (Id. at 92.)

On November 26, 2003, Johnson met with Sutin and Blocksidge to discuss her proposed job reclassification.[3] (Defs.' Ex. 25.) Prior to this meeting, Johnson was told that her proposed reclassification would be considered. She was not promised a reclassification. (Sutin Dep. at

---

[2] Although there is no dispute that the form was signed October 20, 2003, the date appearing on the form with the signature is October 20, 2004. (Sutin Dep. Ex. 14.)

[3] At this meeting, the parties also discussed the addition of two new, full-time staff as well as increases in the contracts and grants department's budget. (Defs.' Ex. 25.)

100.)  At this meeting, Blocksidge told Johnson that she was doing a good job, but that the decision was to wait a year before committing to a reclassification.  (Johnson Dep. vol. 2 at 290; Defs.' Ex. 25.)

On December 5, 2003, Johnson wrote a memorandum to Blocksidge that voiced her disappointment stemming from the November 26, 2003 meeting among Johnson, Blocksidge, and Sutin.  (Defs.' Ex. 25.)  Johnson indicated that she believed that the upgrade of the director of contracts and grants position should be effected "in order to address obvious employment inequities for me and my department within the college."  (Id.)  Johnson stated that she did not agree with the decision to wait a year to reconsider the job reclassification and voiced concerns about adding staff to the contracts and grants department from other areas of the college.  (Id.)

Johnson wrote a second memorandum to Blocksidge on December 5, 2003 regarding the review of her job description and duties.  (Defs.' Ex. 26.)  In that memorandum, Johnson included an original job description, a revised job description, and a comparison highlighting the differences.  (Id.)  Johnson addessed certain job functions that she felt were absent from the new description.  (Id.)  In light of these concerns, Johnson reiterated that, "while I am a team player and as such will continue to follow your directions and do my job to the best of my abilities," she did not agree with Blocksidge's decision to wait a year to revisit her upgrade request.  (Id.)

In response, Sutin directed Shader to review Johnson's concerns and to respond to Blocksidge.  (Defs.' Ex. 27.)  Shader responded to Blocksidge on December 12, 2003:

> As you are aware, the Department of Grants is likely to be reorganized and Dr. Sutin is still working on the reorganization.  Most of the issues raised in Ms. Johnson's letter appear to stem from her assumptions about how the reorganization will unfold.  As you already know and appreciate, until Dr. Sutin finalizes and announces the changes, we are unable to address any issues that the

reorganization could affect. Once Dr. Sutin announces the details any issues in her letter that remain unclear or unresolved can be discussed with Ms. Johnson.

(Id.) Shader noted that, in comparison to similar positions at eight to nine other educational institutions, Johnson's salary was appropriate and within the range of positions at her paygrade. (Id.)

On December 22, 2003, Blocksidge sent Johnson a memorandum that stated: "Pursuant to our meeting with Dr. Sutin, the potential for reexamining your position expansion will be dependent upon the needs of the college and how well you handle your current job responsibilities." (Defs.' Ex. 29.) On January 2, 2004, Johnson responded to Blocksidge: "[B]ased upon the attachment which accompanied your December 22, 2003 memorandum, Dr. Sutin's email of 12/15/03 and our meeting with Dr. Sutin on 11/26/03, my job re-classification will not be reviewed until after Dr. Sutin finalizes and announces the re-organization this month." (Defs.' Ex. 31.) Johnson requested a meeting with Blocksidge to "clarify specific items on the new revised job description." (Id.) Johnson closed by reiterating that she was a team player and would continue to follow Blocksidge's directions. (Id.) Forty-five Caucasian directors were not upgraded to executive director positions. (Affidavit of Lorraine Johnson (L. Johnson Aff.) ¶ 9.)

**Employment Performance**

**Reporting to Davis**

In 2002, as director of contracts and grants, Johnson reported to Betty Davis ("Davis"). (J.S. ¶ 6.) Occasionally, Davis had difficulty keeping track of Johnson's whereabouts. (See Defs.' Exs. 4, 5.) In an email dated May 24, 2002, Davis questioned Johnson about her

whereabouts and asked Johnson to explain. (Defs.' Ex. 4.) Johnson explained why she was out

of the office and detailed the work that she was doing while away from the office. (Id.)

Weeks later, in an email dated July 3, 2002, Davis wrote to Johnson:

I heard it through the grapevine that you are not here today - you were in this morning, but I did not get anything from you on your absence from college office. So that you are aware for the future, please request any time out of the office through me. Given this situation, I will assume that you have taken today as an unpaid day off. I did not approve vacation for you and I did not know where you were planning to be, if you are at one of the campuses or centers. If you are at the campuses or centers, please let me know, as well, what the purpose of your activity is there. It is important that I am aware of where you are; what you are doing and when you are out of the office.

(Defs.' Ex. 5.) In response, Johnson informed Davis of her whereabouts and told Davis that she

should contact Johnson's secretary for information relating to her daily activities. (Id.) Davis

replied:

It is your responsibility to keep your supervisor aware of your activities. It is not my intent to check with your secretary when I need you. I trust you understand that you are expected, as we all are, to inform our supervisors of where we are and what we are doing, for many reasons, first and foremost in the event something occurs that needs your attention. Therefore, please give me a weekly schedule of your activity from this point on - give this to [me] PRIOR to the week in question and keep that activity updated as appropriate. Please give that schedule to Joan Follen who will post it to my schedule, along with all the other members of the staff who report to me.

(Id.)

**Reporting to Blocksidge**

In July 2002, Johnson started reporting to Blocksidge. (J.S. ¶ 97.) Blocksidge requested

that Johnson provide his office with a telephone number so that Blocksidge could contact

Johnson while she was on vacation. (Defs.' Ex. 6.) In a letter dated August 29, 2002,

Blocksidge memorialized a conversation that he had with Johnson regarding contacting her

while she was on vacation.  Blocksidge wrote: "It is important that I am able to communicate with you under these circumstances.  In the future, make certain you leave with my office, a phone number whereby we can contact you."  (Id.)

In July 2003, Blocksidge completed an Administrator Performance Appraisal ("APA") for Johnson's performance during the period from July 1, 2002 to July 30, 2003.  (Defs.' Ex. 12; J.S. ¶ 16.)  Johnson received a rating of 4.75 which was in the "consistently exceeds expectations" category.  (Defs.' Ex. 12.)

**The FIPSE Grant**

In 2002, CCAC sought the college's first international grant from the Fund for the Improvement of Post Secondary Education ("FIPSE ").  (J.S. ¶ 8.)  Johnson's role in obtaining the FIPSE grant was to make sure that the grant writers followed the grant guidelines and that the grant was submitted.  (J.S. ¶ 10.)  In March 2002, the first FIPSE grant application was submitted and later rejected.  (Id.)  In 2003, a second FIPSE grant was submitted.  (J.S. ¶ 11.) In August 2003, CCAC was awarded the FIPSE grant.  (J.S. ¶ 19.)

**FIPSE Conference**

On October 27, 2003, Johnson was the facilitator for a five-day conference that commenced the FIPSE grant project.  (J.S. ¶ 24.)  Sutin was unhappy with the way the event was planned and budgeted.  (Defs.' Ex. 20; J.S. ¶ 25.)  During the event, Johnson became displeased with Davis' behavior and complained about it to Blocksidge and Sutin.  (Defs.' Ex. 19;  J.S. ¶ 26.)   Johnson complained that Davis disagreed with Johnson's choice of speaker for the event. (Defs.' Ex. 19.)  The speaker chosen for the event was Lora Hubbard ("Hubbard"), an African-American female.  (Id.)  Johnson reported that Davis behaved inappropriately at the event,

appearing angry and upset because Davis had not been invited to speak. (Defs.' Ex. 19; Blocksidge Dep. at 98.)

As part of Blocksidge's review of the event, he spoke with eight individuals, including Johnson and Davis. (Defs.' Ex. 22; J.S. ¶¶ 27-29.) Blocksidge reviewed emails sent to coordinate the event. (Id.) Blocksidge submitted a report listing findings, conclusions, and recommendations for future events. (Id.) Blocksidge's report did not specifically mention the incident between Johnson and Davis. (Id.)

**FIPSE Meeting in Portugal**

On October 13, 2003, Johnson requested permission to attend a December 2003 FIPSE grant meeting in Portugal. (J.S. ¶ 23.) Blocksidge initially approved Johnson's request. (Id.) Frank Frankfort ("Frankfort") was a FIPSE coordinator and CCAC's primary contact at the United States Department of Education with regard to the FIPSE grant. (J.S. ¶ 30.) Lowe was CCAC's project director and writer of the FIPSE grants. (J.S. ¶ 31.)

On November 6, 2003, Lowe emailed Frankfort about the FIPSE grant meeting. (Id.) Specifically, Lowe stated that he received notice from the conference organizers that only one member from CCAC should attend the conference and that others should be placed on a wait list. (J.S. ¶ 31; Defs.' Exs. 23, 24.) Lowe questioned who from CCAC should attend the conference. (Defs.' Exs. 23, 24.) On that same day, Frankfort responded to Lowe:

> [G]rant writers [do] not attend this conference. I told [Johnson] about this already. Her attendance was optional only for the first meeting, so clearly she is the first to not go. As for you and the curriculum director, that is a tough one. Probably you for this one, but make sure you both attend the meeting in the U.S. that you and the EC Partners will no doubt have this spring.

(Defs.' Ex.23.)

Blocksidge telephoned Frankfort who told him that Lowe should attend the conference because there was a space issue. (Blocksidge Dep. at 110.) Frankfort informed Blocksidge that only one person should attend. (Id.) In a letter dated December 22, 2003, Blocksidge informed Johnson that only one person should attend the Portugal conference. (Defs.' Ex. 29.) Blocksidge wrote that Lowe, as the project leader, was the most appropriate person to attend. (Id.) Johnson was not placed on a wait list to attend the conference. (J.S. ¶ 34.)

**Supervisor Change**

By letter dated January 20, 2004, Shader informed Johnson that on January 15, 2004, Sutin approved a change in Johnson's reporting structure. (Defs.' Ex. 35.) Shader informed Johnson that she would now report to Burzachechi instead of Blocksidge. (Id.) In an email dated January 23, 2004, Voci informed Johnson that, although APAs were generally completed annually in June, Johnson was required to complete an APA at that time due to the change in her supervisor. (Defs.' Ex. 37.) In an email dated January 28, 2004, Johnson questioned Voci about the need to complete an APA in January rather than in June. (Defs.' Ex. 38.) Johnson noted that, in the past, she was not required to complete a new APA when she was assigned a new supervisor; she questioned whether this was a new process. (Id.) Voci informed Johnson that mid-year APAs were a change in policy that became effective January 22, 2004. (Id.)

Johnson was not the only employee to receive a mid-year APA. (L. Johnson Aff. ¶ 5.) Besides Johnson, three Caucasian employees and one African-American employee received mid-year APAs as a result of a change in their supervisors. (Id.. ¶ 6.)

On February 5, 2004, Blocksidge completed Johnson's APA and rated her 3.5. (Defs.' Ex. 39.) This rating fell under the "meeting expectations" category. (Id.) Johnson met with

Blocksidge to discuss her rating.  (J.S. ¶ 55.)  After their meeting, Blocksidge increased the rating to 3.6, which fell within the "often beyond expectations" category.  (J.S. ¶ 55; Defs.' Ex. 39.)

Prior to the change in supervisor, Blocksidge and Burzchechi did not exchange negative comments about Johnson's work performance.  (Blocksidge Dep. at 63.)  Blocksidge did inform Burzachechi that Johnson was unhappy because of the canceled business trip to Portugal. (Deposition of Nancilee Burzachechi ("Burzachechi Dep.") at 96.)  Prior to the transition of supervisors, Burzachechi was aware that Johnson was typically unavailable in the afternoons. (Id.)

### Reporting to Burzachechi

On January 20, 2004, Johnson and Burzachechi met for their first meeting.  (J.S. ¶ 206.) During this meeting, Johnson expressed her desire for a promotion to executive director. (Burzachechi Dep. Ex. 6.)  Johnson also discussed her dissatisfaction with the update of her job description.  (Burzachechi Dep. vol. 2 Ex. 6.)  Finally, Johnson requested that additional funds be added to her travel budget so that Johnson could travel to a conference in Washington, D.C. (Id.)  Burzachechi denied Johnson's request and informed Johnson that Burzachechi and two others were already traveling to the conference.  (Id.)  Burzachechi informed Johnson that she would consider allowing Johnson to attend  "any meetings with government departments regarding contracts and grants."  (Id.)  Burzachechi requested that Johnson forward to her attention any recommendations for her review.  (Id.)

In late February 2004, Burzachechi denied Johnson's request to serve on a search committee.  (Johnson Verified Statement ("Johnson Aff.") ¶ 84; J.S. ¶ 207.)  In an email dated

February 27, 2004, Johnson indicated that she could not serve on the search committee as a result of her job-related responsibilities. (Johnson Aff. Ex. 68a.)

### Burzachechi's Requirements

Burzachechi required all her direct reports to be present in the office from 8:30 a.m. to 4:30 p.m. (Burzachechi Dep. at 137.) Prior to reporting to Burzachechi, Johnson worked from 7:30 a.m. to 3:30 p.m. because she found it easier for government entities and program directors to return her calls if she called earlier in the day. (Johnson Dep. at 300-05.) On March 10, 2004, Johnson emailed Burzachechi regarding her change of hours. (Burzachechi Dep. Ex. 14.) Johnson notified Burzachechi that she began working the new hours and that the change resulted in problems with reaching her contacts. (Id.) Johnson requested permission to begin work at 7:30 a.m. on Mondays because funders typically returned calls before 8:30 a.m. (Id.) Burzachechi denied Johnson's request to change the hours, but indicated that Johnson was welcome to begin work early. (Burzachechi Dep. at 338-39.) Burzachechi reminded Johnson that she would still be expected to work normal business hours - 8:30 a.m. to 4:30 p.m. (Id.) Kathy Weir ("Weir"), the grants compliance officer who reported to Burzachechi, also worked from 8:30 a.m. to 4:30 p.m. (J.S. ¶ 60.)

By email dated May 5, 2004, Burzachechi wrote to Johnson about work schedules and working from home. (Defs.' Ex. 45.) In that email, Burzachechi wrote:

> Working from home is not an option. This is the second time in 2 weeks that I've been informed that you've chosen to work from home. If you come in to work at noon today, you will be required to report ½ day vacation for this morning.
>
> As I discussed with you in January, as an administrator, you are required to work the regular workday from 8:30 am - 4:30 pm and additional hours when necessary.

14

Beginning May 6th, please submit your appointment calendar for the following work week to me each [sic] via hard-copy each Thursday.

(Id.)  Burachechi forwarded the email to Shader in human resources and requested its formal placement in Johnson's personnel file to document the incident.  (Burzachechi Dep. vol. 2 Ex. 17.)

Burzachechi documented performance issues with Johnson and other employees by writing memoranda and forwarding the memoranda to the human resources department to be added to the relevant employee's personnel file.  (Burzachechi Dep. at 300-03.)  Burzachechi wrote memoranda relating to her direct reports on several occasions and forwarded them to the human resources department.  (Defs.' Exs. 52, 59, 61, 64, 65.)

Burzachechi required both Weir and Johnson to make sure that they documented their respective times.  (J.S. ¶ 58.)  In an email dated May 6, 2004, Burzachechi reminded Johnson and Weir that "[w]eekly appointment calendars and schedules are due to me by end of business each Thursday for the following week."  (Defs.' Ex. 45a.)  Burzachechi required the calendars to contain the following information about each meeting: purpose, time and duration, location, attendees with titles, and contact information.  (Id.)  Weir was also required to email updates as changes took place in her schedule.  (Deposition of Kathy Weir ("Weir Dep.") at 67.)

**HUD/COPC**

At some point in the fall of 2003, Sutin informed Johnson that he had met with members of the community who were interested in partnering with CCAC in a submission for a federal grant sponsored by the Department of Housing and Urban Development ("HUD") known as the COPC grant ("HUD/COPC").  (Johnson Dep. vol. 2 at 228.)  Johnson began working on the

project by meeting with representatives from Mellon Bank, various community groups, and HUD, and continued by identifying focus areas of the project, handling budgetary and funding issues, and developing the mission of the project. (Johnson Dep. vol. 2 at 229-41, 243-45.) On April 19, 2004, Johnson received an email from Dr. Ralph Proctor ("Proctor"), a faculty member at CCAC, indicating that Sutin had asked him to take the lead on the HUD/COPC grant. (Deposition of Ralph Proctor ("Proctor Dep.") Ex. 13.) Specifically, Proctor testified about how he became the lead on the project:

> [Sutin and Proctor] were in a meeting discussing the problems relative to funding shortfalls and asked whether or not they had ever applied for a COPC grant and described it to him and he said as far as he knew they had not and would I mind taking a look into it and take the lead on creating one if in fact we did not have one.

(Proctor Dep. at 65.) CCAC could only submit one application. Since Johnson had been working with the community partners on a HUD/COPC proposal and Proctor was now to take the lead, Johnson emailed Burzachechi asking how to proceed. (Proctor Dep. Ex. 13.) Burzachechi scheduled a meeting with Johnson to discuss the situation. (Id.)

At some point in either late April or early May 2004, Johnson was informed that Burzachechi had hired Dr. Emma Mosley ("Mosley") as a consultant on the HUD/COPC grant. (Johnson Dep. vol. 2 at 251-52.) Burzachechi instructed Johnson to step back and to turn over all her work and control of the project to Proctor and Mosley. (Id. at 254-55.) While Johnson was not instructed or informed regarding any role she would have in the writing of the grant proposal, Johnson assumed that either Proctor or Mosley would be responsible because they were the experts involved and the norm is for the experts to write the proposal. (Id. at 255.) Johnson understood that her role at this point was to be available to assist Proctor and Mosley

should they request it, but otherwise to step back from the project. (Id. at 255-56, 267.)

On June 2, 2004, Johnson requested vacation time from June 25, 2004 to July 6, 2004. (Defs.' Ex. 47.) Burzachechi agreed to this request, provided that all of Johnson's projects and deadlines were covered and that the vacation would present no problems for the HUD/COPC grant. (Id.) Johnson replied that there would be no problems for HUD/COPC as she had already submitted three-quarters of the grant content to Mosley with the remainder to be submitted by the end of the week. (Id.) The due date for the grant proposal was July 9, 2004. (Johnson Dep. at 266.) On June 21, 2004, Johnson emailed Proctor, copying Mosley and Burzachechi, asking if Proctor would like to meet to discuss anything related to HUD/COPC, as she would be leaving for vacation. (Johnson Aff. Ex. 79.) On June 22, 2004, Proctor responded by requesting certain specific information from Johnson such as "secur[ing] the DUNS number and check[ing] on the progress of the Indirect Costs negotiations." (Johnson Aff. Ex. 82.) On June 23, 2004, Johnson emailed Proctor, forwarding information about the various community partners to the HUD/COPC grant. (Id.) The email included the information that Proctor had requested, as well as contact persons and information needed for the partners to construct their letters of support. (Id.)

Burzachechi had instructed Johnson to attend a meeting of the external committee on June 24, 2004 from 5:30 p.m. to 7:00 p.m. which Johnson attended but left early to go to a part-time job. (Defs.' Exs. 47, 49.) On June 25, 2004, Johnson emailed Burzachechi, reporting on the events of the June 24, 2004 meeting, to which Burzachechi responded that she "was concerned to hear that [Johnson] left the meeting early to work at a part-time job." (Defs.' Ex. 50.) Burzachechi expressed further concern that on the first day of Johnson's vacation, which

had been granted on the condition that all Johnson's work be completed or covered, Burzachechi had received multiple calls regarding incomplete projects, including a "failure to follow-up with request to begin process to negotiate with the federal government for indirect costs" on the HUD/COPC grant.[4]  (Id.)

On June 28, 2004, Burzachechi wrote to Proctor regarding the HUD/COPC negotiation for the indirect cost rate:

> I would also like to apologize for the progress, or lack thereof, that Sheila Johnson has made on the component projects she was responsible for, especially given the very tight timetable that we've committed to.  I had clear expectations of Sheila Johnson for a very high level of involvement in and responsibility for this exciting project.  I am very sorry that a member of my staff failed to collaborate with you both, and with our team, effectively and enthusiastically. Please do not hesitate to call upon me, Kathy Weir or Natasha [Simpson/Walton] to help in any way we can with the submission of this important grant.

(Proctor Dep. Ex. 33.)  That same day, Proctor responded to Burzachechi with a complaint about Johnson's work, while complementing Burzachechi, Natasha Simpson/Walton ("Simpson/Walton), and Weir for their efforts.  (Id.)  Specifically, Proctor stated: "I just cannot understand why [Johnson] gives out so much incorrect information.  I don't know if she misleads on purpose, or simply believes the stuff she hands out." (Defs.' Ex. 51.)  Proctor voiced an additional complaint in regard to indirect cost negotiation:

> The best thing we can do now is to try to find out whether [Johnson] really started the process and with whom, if anyone, she is negotiating.  She said she asked for a rate of 10%.  That is ludicrously low given the percentages Pitt (49%) and Duquesne (79%) have negotiated.  [Johnson] did not share any documents with us relative to this issue.  Does [Simpson/Walton] recall having typed anything for this?  If not, it probably has not been started.

---

4  Additional complaints were related to Johnson's work on a Mellon Student Internship and on the FIPSE grant. (Defs.' Ex. 50.)

(Id.)

On June 29, 2004, Proctor informed Burzachechi of additional problems with the

HUD/COPC grant resulting from Johnson's incomplete work. (Defs.' Ex. 52.) Specifically,

Proctor stated:

> [Johnson] did, indeed, talk to the persons contacted [at the various community
> organizations] about possible inclusion in the HUD grant proposal. However, the
> conversations went not much further. None, except INROADS had discussed
> budgetary requirements. * * * They had not come up with an action plan, a
> curriculum or other documents relating to the proposed activity. They cannot
> issue a letter of support, from the local office. Time is too short to craft an
> explation [sic] of the program, send it to their national headquarters and get it
> back, in a timely fashion, for inclusion in the proposal.
>
> Both the IBEW and Mellon indicated that they had not been asked to put together
> any papers relative to curriculum, costs or guaranteed acceptance. * * * So, it
> appears that much of what [Johnson] presented, as a solid program, was largely
> crafted from conversations. At this point I do not feel that we have the time to
> create a viable, fundable program out of these uncoordinated [sic] bits and pieces.

(Id.) Proctor concluded by indicating his belief that Johnson may try to blame him, as well as

Mosley and Will Thompkins. (Id.) As a result, Burzachechi passed the information along to

Shader and Sutin for inclusion in Johnson's file and to inform them that she would be returning

early from her vacation in order to attend to the problems. (Id.) Burzachechi additionally wrote

to Shader:

> As you're aware, the situation with Sheila Johnson's behavior is escalating. I've
> forwarded several e-mail messages to Human Resources to be added to her file.
> Due to the progressive nature of this problem and the fact that Sheila is part of a
> protected class, I'd like to schedule a meeting with you and [counsel] to insure
> that we are protected.

(Johnson Aff. Ex. 85.)

Also on June 29, 2004, Burzachechi received an email sent to Johnson and Burzachechi

from Melissa Denardo, coordinator of CCAC's survivability and information assurance program,

regarding another issue - a situation involving reimbursement of airfare for participants in a CCAC workshop, which Johnson was assigned to resolve on June 4, 2004. (Supplemental Affidavit of Sheila Johnson ("Johnson Suppl. Aff.") Ex. S-5.) Burzachechi responded:

> I'm sorry about the state of this situation. [Johnson] failed to provide me with an update of the status of this project and she is away on vacation until Friday, July 9. I am copying Natasha Simpson[/Walton] and Kathy Weir on this message in order to elicit their assistance in resolving this issue. I will also be available to help in any way I can. Again, I'm sorry that we've failed to resolve this issue.

(Id.)

On July 9, 2004, in response to Burzachechi's email on June 25, 2004 regarding reports of incomplete work on the part of Johnson and disapproval of Johnson's early departure from the June 24, 2004 meeting, Johnson wrote to Burzachechi, "I now know that I was wrong and you can be assured that this situation will not occur in the future." (Defs.' Ex. 53.) With regard to Burzachechi's statement that Johnson exhibited a "failure to follow-up with request to begin process to negotiate with the federal government for indirect costs," Johnson indicated that "[t]his process has begun" and expanded on the details. (Id.)

On July 14, 2004, Proctor emailed Johnson. (Defs.' Ex. 54.) The email listed his criticisms of her work on HUD/COPC: he had indicated to Johnson that Mosley was not to write the proposal; the proposal would be built around what Johnson had already created over the last year; Johnson had indicated that the proposal could be submitted electronically, which proved incorrect and cost the staff valuable time; no formal advisory committee had been created per HUD's requirements; demographic information, which Proctor believed should be readily available in any grants office, was not available; and no negotiated Indirect Cost Factor was included, which Proctor again thought should be readily available at any grants office. (Id.)

With regard to the lack of an Indirect Cost Factor, which would cause the grant proposal to lose award points, Proctor felt that "CCAC should have had this in 1966. The fact that it was never done is an indication of the lack of understanding of governmental grant procedures." (Id.) Proctor indicated concerns about Johnson's role in general:

> Another problem appears to center arould [sic] a lack of understanding as to what, speciffically [sic], your role is. Some think you are a proposal writer, some think you are a grant manager and others are simply confused, as evidenced by the fact that people, outside the grants office, assured me that you had information that did not even exist. I don't know if you have a job description, but if not, one needs to be developed in keeping with best practices in proposal writing. If one does exist, it needs to be carefully examined. If you are not a proposal writer, that information needs to get out. Given all that I encountered, it is no surprise that not many people agree to write proposals, especially since there seems to be no incentive to do so.

(Id.) Proctor complained to Sutin about Johnson's performance. (Sutin Dep. 82, 87-88.)

In July 2004, Johnson requested permission to attend a conference at which, "if afforded the opportunity to do so," she was to speak, but Burzachechi denied the request. (Burzachechi Dep. at 203; Johnson Aff. Ex. 81.) Burzachechi emailed Johnson:

> The cost of the conference versus the benefit is one concern. I also have reservations about permitting you to be out of the office so much of July when you've made it clear that this is your busiest time. Following your two week vacation (6/25-7/8) with another three days (7/14-7/16) away from the office concerns me. I would rather that you use this time to develop goals and objectives and your plan for contracts and grants for the coming year.

(Id.) During Burzachechi's deposition, she elaborated on her reasons for not permitting Johnson to attend the conference:

> Q. Do you think that having employees who represent CCAC speak at a national conference is detrimental to CCAC?
> A. If it impinges upon their ability to conduct their regular work responsibilities, yes, I do.
> Q. And would you say that speaking at a conference would impinge on her ability to do her regular work?

A. At that time when she was floundering in her position, yes, I do.

(Burzachechi Dep. at 204.) When asked to expand on what she meant by "floundering,"

Burzachechi said that the difficulties that Johnson was having were indicated on her performance

appraisal. (Id. at 204-205.) In the comments on Johnson's performance appraisal, Burzachechi

noted:

> Objective #2 [listed by Johnson as "[b]uild national linkages via the Council for Resource Development to showcase CCAC's Contracts and Grants 'Best Practices' in order to increase chances of CCAC receiving federal grant awards . . ."] is not an appropriate objective, but is part of individual professional development . . . . I am concerned that [Johnson] fails to comprehend the position's primary responsibility to actively identify and pursue new and recurring grants and to creatively expand the existing program. I am also concerned that [Johnson] places far too much of her time on "external" functions when the position is largely an internal resource and support for the college.

(Defs.' Ex. 55.)

**Burzachechi's Performance Evaluation of Johnson**

On June 7, 2004, Burzachechi wrote to Sutin that, although Johnson had performed well

on one assignment, Burzachechi had reservations about Johnson's performance and reliability.

(Sutin Dep. Ex. 40.) Burzachechi met with Sutin and reported that Johnson also had a habit of

being unavailable during afternoon hours. (Sutin Dep. Ex. 40; Sutin Dep. at 170.) Johnson's

2004 monthly calendars listed appointments and meetings during afternoon hours. (Johnson Aff.

Ex. 99b.)

By email dated July 21, 2004, Shader notified CCAC administrators that a "3% increase

on the midpoint of the range was approved for Administrators." (Johnson Aff. Ex. 86a.) Shader

indicated that the increase would be included in the employee's July 30, 2004 paycheck. (Id.)

On July 26, 2004, Burzachechi notified Sutin and Shader about Johnson's performance.

(Johnson Aff. Ex. 87.)  In the communication, Burzachechi attached a copy of Johnson's July 30, 2004 APA.  (Id.)  Burzachechi explained that Johnson received a performance review indicating that she was performing below expectations.  (Id.)  Burzachechi questioned whether Johnson should receive the administrative increase in her July 30, 2004 paycheck.  (Id.)  In response to Burzachechi's email, Sutin explained that Burzachechi could "hold open the option of a six month review, with pay increase subject to improved and fully satisfactory performance." (Johnson Aff. Ex. 88.)  By email dated July 27, 2004, Shader advised Joe Miller ("Miller"), personnel generalist, that he should make an appropriate adjustment to Johnson's paycheck based on her performance review.  (Id.)

On July 28, 2004, Miller contacted Johnson about her administrative increase.  (Defs.' Ex. 57.)  Miller informed Johnson that he had recently received information indicating that Johnson's job performance was below expectations.  (Id.)  Miller advised Johnson that Burzachechi "may hold open the option of a six month review with pay increase subject to improved and fully satisfactory performance.  Based on this information, your pay will be adjusted in August and you will not be receiving the July 1, 2004 administrative increase."  (Id.) As a result, on July 28, 2004, Jill Schutz, director of payroll, informed Johnson that the "Payroll Department processed a July Administrative increase for you and we were subsequently notified not to process the raise.  Since the July payroll has already been processed, you have been overpaid for the month of July.  We will make an adjustment to your August pay."  (Defs.' Ex. 58.)

On August 3, 2004, Burzachechi finalized an APA for Johnson.  (Defs.' Ex. 55.) In this APA, Burzachechi rated Johnson's performance at a rate of 2.0 out of 5.0.  (Defs.' Exs. 55-56.)

A rating of 2.0 fell within the "below expectations" category. (Defs.' Ex. 55.) After meeting with Johnson about her performance rating, Burzachechi agreed to increase the rating from 2.0 to 2.1. (Defs.' Ex. 56.)

In an email dated August 5, 2004, Burzachechi informed Shader about her meeting with Johnson, which related to Johnson's performance review. (Id.) Burzachechi informed Shader about the meeting:

> I discussed my decision to hold back the administrative increase for further review on October 1. On that date if [Johnson] is able to demonstrate significant improvement toward achieving her stated goals and objectives, I will consider awarding the 3% administrative pay increase to her, retroactive to July 1st.

(Id.) (emphasis in original). In a memorandum dated August 6, 2004, Burzachechi memorialized her conversations with Johnson relating to Johnson's latest performance review. (Defs.' Ex. 59.) In that memorandum, Burzachechi restated her concerns regarding Johnson's performance and set forth a remediation plan for Johnson. (Id.)

In response to Burzachechi's performance review, on August 5, 2004, Johnson sent Burzachechi an email requesting clarification relating to the performance review process. (Defs.' Ex. 62.) Johnson indicated that Burzachechi's suggested three-month review period was in contradiction to the college's policy relating to employment reviews. (Id. 62.) On the same day, Burzachechi responded that Johnson would be reviewed again in six months and requested Johnson to meet with her the following week to discuss the remediation plan. (Id.) On August 6, 2004, Johnson sent an email to Shader questioning why her salary was being adjusted to withdraw her raise when Johnson had an ongoing appeal pending. (Johnson Aff. Ex. 89.)

Notwithstanding Johnson's performance review, in an email dated August 6, 2004, Burzachechi approved eight vacation days for Johnson. (Defs.' Ex. 60; J.S. ¶ 98.)

**Johnson Appeals Burzachechi's Performance Review**

On August 6, 2004, Johnson notified Burzachechi that she intended to appeal Burzachechi's APA. (Defs.' Ex. 62.) Johnson informed Burzachechi that she would not sign the APA form. (Id.) In an email dated August 9, 2004, Sutin wrote to Johnson and Shader regarding Johnson's performance evaluation appeal. (Defs.' Ex. 63.) In that email, Sutin indicated that he had received Johnson's appeal and requested Shader to arrange a meeting about the issue. (Id.) Sutin explained that the purpose of the meeting was to provide Johnson with an opportunity to "present [her] case for reconsideration of [her] performance rating." (Id.)

By email dated August 16, 2004, Shader informed Johnson that Sutin would meet with Johnson about her performance review on August 17, 2004. (Defs.' Ex. 66.) Shader explained that Johnson should come to the meeting prepared to explain why the APA was not valid. (Id.) Shader also requested that Johnson bring copies of any documentation that supported Johnson's appeal. (Id.) Shader explained the appeals procedure:

> Any person who feels that his/her periodic performance appraisal is not valid may appeal the results to the next higher level of supervision. That supervisor shall review the appraisal with both the appellant and his/her supervisor and record his/her decision with Human Resources.

(Id. 66.)

**Medical Leave Begins**

On August 17, 2004, Johnson sent an email to Shader, copying Sutin and Burzachechi:

> Due to job related stress, my doctor (Dr. Khan) made the decision to remove me from work for at least 30 days. I was unable to attend today's meeting due to my doctor's appointment. When my doctor releases me, I will contact you regarding either rescheduling today's meeting if Dr. Sutin needs more information or obtaining information regarding the current status of my Performance Appraisal Appeal.

(Defs.' Ex. 68.)  Johnson indicated that the stress manifested itself in the forms of elevated blood pressure, skin irritations, bladder problems, and anxiety. (Johnson Dep. at 112.)  Also on August 17, 2004, Johnson contacted Voci to determine if there were any forms that she needed to complete for workers' compensation or disability, requesting that any such forms be mailed to her home.  (Defs.' Ex. 70.)  Prior to August 17, 2004, neither Burzachechi nor Weir was aware that Johnson was affected by work-related stress.  (J.S. ¶¶ 111, 112.)  After thirty days, Johnson felt that mentally she could return to her position on a full-time basis, but that she was never physically able to return to work.  (Johnson Dep. at 138-40.)

At some point after Johnson began her leave, Simpson/Walton reported to Burzachechi that files were missing from Johnson's office.  (Deposition of Natasha Walton ("Walton Dep.") at 122-26.)  Simpson/Walton called Johnson and left her a message indicating that files were missing from her office.  (Walton Dep. at 126.)  Johnson did not return Simpson/Walton's telephone call.  (Id.)  Because of the missing files and Johnson's previous concerns about the security of the office, Burzachechi had the office locks changed.  (Burzachechi Dep. at 249.)  Burzachechi indicated to Shader concern that Johnson had after-hours access to the office.  (Deposition of Jeanne Shader ("Shader Dep.") Ex. S-10.)  Additionally, Johnson's email access was restricted shortly after she went on leave.  (Burzachechi Dep. at 238-39.)  College policy, in effect before Johnson's leave on August 17, 2004, was to deny email access to employees on medical leave.  (Defs.' Exs. 91, 93; Deposition of Carol Voci ("Voci Dep.") at 86-88.)

On August 23, 2004, Voci sent a letter to Johnson indicating that human resources had received information from Johnson's doctor regarding her leave and that, because Johnson's leave was due to an occupational injury/disease, Johnson would need to apply for workers'

compensation. (Defs.' Ex. 71.) The letter directed Johnson to contact Randy Gaab ("Gaab"), director of safety and risk management, to process the claim. (Id. 71.) On August 26, 2004, Johnson received several forms from CCAC regarding workers' compensation claims. (Defs.' Ex. 72.) According to Voci, when an employee is denied workers' compensation, CCAC does not award short-term disability benefits. (Voci Dep. at 27-28.) Voci commented that, although she was not certain of a standard, she had a belief that workers' compensation claims for stress-related injuries are almost always denied. (Id. at 30.)

On August 27, 2004, CCAC advised Johnson that, in order to return to work, she was required to submit a "full medical release", i.e., that she could return to her position with no limitations. (Defs.' Ex. 73.) Also on August 27, 2004, Johnson faxed to Gaab questions regarding the workers' compensation forms. (Defs.' Ex. 74.) Johnson had originally called Gaab on August 26, 2004, but she left only a voicemail message for him. (Id.) In the facsimile, she refers to her injury as "a stress job related injury based upon race discrimination over time." (Id.) Johnson's workers' compensation claim was denied. (Johnson Aff. Ex. 94.)

On October 11, 2004, Johnson requested from Gaab a "detailed description of the college's short and long-term disability program" and asked for any necessary forms. (Defs.' Ex. 75.) On October 20, 2004, Voci sent to Johnson a letter including a summary of the short-term disability coverage, forms, and instructions. (Defs.' Ex. 76.) The summary of the coverage stated:

> Administrators shall be allowed short-term disability leave with pay beginning with the eighth calendar day of a continuous *non-work related* sickness or injury up to ninety calendar days of continuous sickness or injury. The employee shall provide a signed statement from a licensed physician or licensed health practitioner describing the disability and the expected length of absence.

(Id.) (emphasis added).  The summary further advised that an employee may be eligible for long-term disability if the leave extends beyond 90 days, but because the outside provider may take six to eight weeks to process a claim, it is advisable to apply before the end of the second month of short-term leave.  (Johnson Dep. Ex. 95.)  Johnson did not apply for long-term disability benefits from CCAC.  (Defs.' Ex. 95 at 10.)

Prior to August 27, 2004, CCAC did not supply, nor did Johnson request, any forms or information about FMLA leave.  (Id. at 8.)  On October 25, 2004, Voci sent a letter to Johnson:

> When you were first absent from work, you anticipated returning to work shortly. With the receipt of [a letter from Johnson's psychologist on October 4, 2004 stating Johnson would be absent from work until November 9, 2004], we have determined that all subsequent time that you are absent for the condition described in the October 4 letter shall be designated as [FMLA] leave, *effective as of the date of this letter*. * * * By beginning to run FMLA leave, the College is neither endorsing your claim for worker's [sic] compensation leave nor agreeing that the alleged medical condition(s) forming the basis of your worker's [sic] compensation claim exists. * * * You may be asked to provide additional information so that the College can better assess you condition and entitlement to FMLA leave. * * * If you do not believe that FMLA leave should apply or if you have any questions, please call Carol Voci…Otherwise the College will assume that you understand that you are also on FMLA leave and agree with this treatment.

(Defs.' Ex. 77) (emphasis added).  Included with the letter was CCAC's Guidelines to the Family and Medical Leave Act Policy ("FMLA Policy"), which Voci referred to as "material setting forth your FMLA rights in more detail."  (Id.)  Subsection (A)(1) of Section IV of the FMLA Policy, "Procedures for Requesting Leave," stated that "[i]n all cases, employees will be asked to complete a 'Request for FMLA Leave' form."  (Id.)  Johnson responded, on October 28, 2004, that she did not request FMLA leave: "I don't know how [CCAC] thought I had applied for FMLA also.  I haven't even completed a FMLA application."  (Defs.' Ex. 78.)

On November 8, 2004, Voci sent a letter to Johnson stating that, because Johnson's physician certified her condition as an occupational injury or disease, the Pennsylvania Workers' Compensation Act makes it clear that workers' compensation is an employee's exclusive remedy, and therefore her short-term disability request was denied. (Defs.' Ex. 79.)

According to section (I)(B) of the FMLA Policy, Johnson's FMLA leave, which began October 25, 2004 per the letter from Voci, entitled her to twelve weeks of unpaid leave in a twelve-month period, with the 12 months calculated from the first day of leave.[5] (Defs.' Ex. 77.) Section (I)(E) of the policy, "Intermittent Leave,"[6] allows for employees taking leave for personal illness to do so on an intermittent basis or "by reducing the employee's scheduled work hours, if the employee provides certification from the health care provider . . . that leave must be taken in that manner." (Id.) Section (VII)(G) of the FMLA Policy, "Failure to Return to Work," stated in full that "[e]mployees who fail to return to work after FMLA leave shall be treated as having voluntarily terminated their employment." (Id.) Between August 1, 2004 and January 31, 2005, Johnson never requested intermittent leave or to return on a part-time or reduced-schedule basis. (Defs.' Ex. 95 at 6-7.) Johnson stated in her deposition that the only request she made was for an extension under FMLA. (Johnson Dep. vol. I at 145.)

On December 21, 2004, Johnson wrote to Voci requesting an extension of her current leave based upon the FMLA, CCAC's FMLA Policy, and as an accommodation under the ADA.

---

[5] Johnson stated in her affidavit that she had previously only been given a version of the FMLA Policy dated August 1, 2001, in which the twelve-month period is a set term from September 1 through August 31. (Johnson Aff. Ex. 2)

[6] Johnson claims intermittent leave was not available to her based on the August 27, 2004 letter stating that "[b]efore [Johnson] can return to work, [she] must submit a full medical release that [she is] able to return to [her] position full-time with no limitations." (Defs.' Ex. 73.)

(Defs.' Ex. 81.)  Voci responded that Johnson's leave would end on Sunday, January 16, 2005 and that at least two weeks' advanced notice was required before returning to work.[7]  (Defs.' Ex. 82.)  On January 18, 2005, Shader sent a letter to Johnson indicating that, because Johnson had not reported to work by January 18, 2005, her employment with CCAC was "brought to a closure effective January 17, 2005." (Defs.' Ex. 84.)

Plaintiff was able to retain her part-time employment as an online instructor for the University of Phoenix and as minister of music for her church.  (J.S. ¶ 147.)  Plaintiff asserts that she was able to maintain employment with the University of Phoenix because it was an on-line teaching position and plaintiff was able to use the restroom at any time.  (Johnson Aff. ¶ 153.)  At CCAC, there was only one restroom facility for women on the floor where Johnson worked.  (J.S. ¶ 147.)  That restroom had only two stalls and was used by students.  (Id.)[8]  With respect to her condition at the time of her deposition, plaintiff stated that the "intensity of the bladder problems diminished over time but peaked when [she was] confronted with work related maters even with medication."  (Johnson Aff. ¶ 125.)

### Similarly Situated Individuals

Johnson alleges that seven Caucasian administrators at CCAC, who are similarly situated, were more favorably treated.  The individuals are Mary Jo Magnone ("Magnone"), Sam

---

[7] Two weeks from the date of the letter was Monday, January 17, 2005, the first work day immediately following the end of Johnson's  FMLA leave.

[8] In her response to defendant's assertion in the joint statement of material facts at ¶ 147, plaintiff makes assertions with respect to the availability and description of the bathroom facilities at CCAC.  Although plaintiff cites to portions of her deposition in support of these assertions, she failed to provide the court with these portions of her deposition transcript.  For purposes of summary judgment, and because defendants do not dispute the asserted facts, the court will assume that plaintiff's assertions are correct.

Mangieri ("Mangieri"), Charles Martoni ("Martoni"), Alice Sheets ("Sheets"), Maureen Stradley ("Stradley"), Margaret Betlyn "(Betlyn") and Todd. (J.S. ¶ 149.) Of these individuals, Johnson believed that Sheets was approved for a workers' compensation claim. (Johnson Dep. at 158.) Johnson did not know whether Magnone, Mangieri, Martoni, Stradley, Betlyn, or Todd had applied for or had received workers' compensation. (Id. 154-60.)

Aside from employees whose workers' compensation claims were granted, there were no employees at CCAC who had been off for a medical condition and returned on a part-time basis. (Voci Dep. at 30-31.) Magnone and Betlyn applied for and received short-term and long-term disability benefits. (J.S. ¶¶ 150, 155.) Mangieri and Martoni applied for and received short-term disability benefits. (Id. ¶¶ 151, 152.) Sheets received short-term disability and workers' compensation benefits. (Id. ¶ 153.) Stradley never took any extended medical or FMLA leave. (L. Johnson Aff. ¶10.) Todd received medical benefits from workers' compensation, but was not absent from work long enough to receive other workers' compensation benefits. (Id. ¶12.)

### Johnson's Black Caucus Involvement

Sometime in the early 1990s, Johnson became a member of the CCAC Black Caucus.[9] (Johnson Dep. at 99.) In May 2003, the Black Caucus wrote to CCAC's interim president, questioning the search process for the new president of the college. (Proctor Dep. at 26-28, Ex. 2.) In August 2003, Sutin became the president of CCAC. (J.S. ¶ 17.)

---

[9] Though officially titled the "Community College of Allegheny County African American Caucus", plaintiff refers to the group as the "Black Caucus" and this court will use the same reference for that group. It appears from the record that the purpose of the Black Caucus was to address issues related to equal opportunity for minorities and women. (J.S. ¶ 184.)

As a membership chair and an elected officer of the Black Caucus, Johnson planned a presentation to Sutin to discuss the selection processes for promoting administrators.  (Id. ¶ 183.) Johnson presented on the issue of CCAC's employment and promotion of African-Americans. (Johnson Aff. ¶ 21.)  In her presentation, Johnson also addressed the processes used to hire or to promote administrators.  (Id.)

During the search for the vice president position, Sutin received a number of concerns about the search process.  (Sutin Dep. at 58-60.)  Specifically, the Black Caucus raised issues about the equity and inclusion of African-American employees.  (Id.)  Sutin learned that several people were lobbying for individuals to receive promotions.  (Id.)  As a result, Sutin suspended the search on September 11, 2003 so that the process could be reviewed.  (Id.)  Blocksidge's friend was a candidate for the vice president position.  (Johnson Aff. ¶ 23.)  Another employee told Johnson that Blocksidge blamed Johnson for the suspension of the vice president search. (Id.)

On December 18, 2003, the Black Caucus sent a letter to Sutin complaining about the lack of appointments and upgrades for African-Americans.  (Sutin Dep. Ex. 29.) The letter addressed the lack of African-American input in the college's decision-making process.  (Id.) With respect to Shader, Johnson believed that Shader knew that she was a member of the Black Caucus because emails regarding Black Caucus events were sent through the CCAC email system.  (Johnson Dep. at 99-103.)  Johnson also believed that Shader knew that she was a member of the Black Caucus because Shader was involved in the compilation of an accreditation report, which contained information related to the Black Caucus.  (Id.)  Johnson did not know whether the accreditation report contained the names of Black Caucus members. (Id.)  Shader

averted that she was not aware that Johnson was a member of the Black Caucus until the filing of this lawsuit. (Affidavit of Jeanne Shader ("Shader Aff.") ¶ 4.)

With respect to Burzachechi, Johnson remembers telling Burzachechi that she had to go to a "caucus meeting." (Johnson Dep. at 103-05.) Johnson also sent Black Caucus email correspondence to Sutin and believed that Burzachechi had access to Sutin's email. (Id.) Burzachechi averred that she was not aware that Johnson was a member of the Black Caucus until the filing of this lawsuit. (Affidavit of Nancilee Burzachechi ("Burzachechi Aff.") ¶ 4.)

With respect to Blocksidge, Johnson believes that Blocksidge knew that she was a member of the Black Caucus because Blocksidge had access to Johnson's calendar, which included Black Caucus meetings. (Johnson Dep. at 105-06; 110-11.) Johnson did not know, however, whether Blocksidge accessed her calendar. (Johnson Dep. at 111 .) Blocksidge averred that he was not aware that Johnson was a member of the Black Caucus until the filing of this lawsuit. (Blocksidge Aff. ¶ 4.)

Sutin promoted black males who were members of the Black Caucus and who had previously raised discrimination issues. (J.S. ¶ 238.) The black males who were promoted included Proctor, Elmer Haymon, and Rick Adams. (Id.)

**CCAC's Treatment of Other Minorities**

On July 24, 2006, CCAC disclosed its promotion and hiring practices during Sutin's tenure as president of CCAC to the Allegheny County Counsel Special Committee on Government Reform. (J.S. ¶ 93.) Sutin was president of CCAC from August 2003 through October 2006. The information stated that there were a total of sixteen administrative

appointments during Sutin's administration: fifty percent were women and thirty-eight percent were minorities.[10]  (Defs.' Ex. 94.)

During Sutin's tenure, two African-American females (not including Johnson) and one Caucasian female were terminated as a part of a work force reduction.  (Sutin Dep. at 16-20.) All these females, like Johnson, had Ph.D.s.  (Id.)  No Caucasian males with Ph.D.s were terminated in the reduction.  (Id. at 20.)  Sutin, however, promoted at least three African-American males who were also members of the Black Caucus.  (Johnson Aff. ¶ 158; J.S. ¶ 121.) Lorraine Johnson, an African-American female, worked as a secretary under Shader until she earned her psychology degree in July 2003.  (J.S. ¶ 102; L. Johnson Aff. ¶ 7.)  At that time, she was promoted to senior administrator secretary to labor relations administrator.  (Id.)  In March 2004, Simpson/Walton, an African-American female, was promoted within the grants department to senior secretary and reported directly to Burzachechi.  (Walton Dep. at 12, 139.)

Hubbard, the African-American speaker at the FIPSE event, coordinated the CCAC New Choice/New Options program.  (Affidavit of Lora Hubbard ("Hubbard Aff.") ¶¶ 7, 9.)  She worked at CCAC from August 2001 through November 2003.  (Id. ¶ 9.)  In addition to her salary, she received a stipend during her employment at CCAC.  (Id. ¶ 8.)  In November 2003, Hubbard wrote to Blocksidge regarding CCAC's failure to pay her stipend.  (J.S. ¶ 106.)  The

10  Johnson denies the accuracy of this information. (J.S. ¶¶ 93-94.)  CCAC organizational charts show that between November 1, 2003 and January 31, 2004, Kevin Smay, who plaintiff asserts is Caucasian, moved from director of planning & research (Grade 16) to executive director of strategic planning (Grade 17).  (Blocksidge Dep. Exs. 4, 5.)  Kevin Smay does not appear on the information provided by CCAC to the County Special Committee.  (Defs.' Ex. 94.) Additionally, defendant Shader appears on the November 1, 2003 chart as director of human resources (Grade 17) and as the executive director of human resources (remaining at Grade 17) on January 31, 2004 chart.  (Blocksidge Dep. Exs. 4, 5.)

payment of the stipend was ultimately denied in a letter sent by the human resources department. (Hubbard Aff. ¶ 21.)  In January 2004, Hubbard complained about the decision because she believed that CCAC's decision was discriminatory.  (See Hubbard Aff.)

## Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated when there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury court return a verdict for the nonmoving party.  Anderson, 477 U.S. at 249.

The Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), that:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file."  Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

Id. at 324. There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). The nonmoving party must prove beyond a "mere scintilla" of evidence that a genuine issue of material fact exists and may not rest on the allegations set forth in its pleadings. Big Apple BMW v. BMW of N. Am., 974 F.2d 1358, 1363 (3d Cir. 1992).

Moreover, a "party cannot rely upon self-serving conclusions, unsupported by specific facts in the record." LaResca v. AT&T, 161 F.Supp. 2d 323, 327 (D.N.J.2001)(citing Celotex, 477 U.S. at 322-23). Federal Rule of Civil Procedure 56(e) requires that an affidavit in opposition to a motion for summary judgment must be based upon personal knowledge and must establish that those facts will be admissible. Blain v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002); Maldonado v. Ramirez, 757 F.2d 48, 50 (3d Cir. 1985).

## DISCUSSION

### I. General

Defendants seek summary judgment in their favor with respect to all plaintiff's claims. Plaintiff asserts that there are genuine issues of material fact in dispute for each claim and that summary judgment cannot be granted in defendants' favor. The court will address all plaintiff's claims.

### II. Race and Gender Discrimination Claims (Counts I, IV, and VI)

#### A. Elements of a prima facie case

36

Plaintiff's disparate treatment race and gender discrimination claims under Title VII, section 1981, and the PHRA are analyzed together for summary judgment purposes. See Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999). Title VII was enacted to prohibit employers from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment. Wilkerson v. New Media Technology Charter School Inc., 522 F.3d 315 (3d Cir.2008) (citing Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 224 n. 4 (3d Cir.2000) (quoting 42 U.S.C. § 2000e-2(a)(1))). Since 1972 Title VII has required that personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex or national origin." 42 U.S.C. § 2000e-16(a). The Supreme Court recognized that it is often difficult to prove that an employer acted with conscious intent to discriminate. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). One manner in which plaintiffs can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

In McDonnell Douglas, the Supreme Court developed the now familiar burden-shifting framework for courts to utilize as a tool in analyzing disparate treatment claims. The McDonnell Douglas framework requires a plaintiff alleging a violation of Title VII to first establish a prima facie case of discrimination. The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." Burdine, 450 U.S. at 254; see also Id. at n.6. In so doing, "the prima facie

case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" Id.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers, 142 F.3d 639, 644 n.5 (3d Cir. 1998). The burden of the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision . . . ." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (emphasis added)(citations omitted).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the McDonnell Douglas framework – with its presumptions and burdens' – disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non*,'. . . ." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-43 (2000) (citations omitted). The plaintiff, has the burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d at 410.

To state a claim for discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position for which she applied; (3) she suffered an adverse employment decision; and (4) similarly situated individuals outside the protected class were hired or promoted instead. Sheridan v. E.I. Dupont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996).

It is undisputed that the first two elements are met: plaintiff is a member of a protected class for both her race and gender discrimination claims and plaintiff was qualified for her position, the interim vice president position, the vice president position, and the position of dean of occupational technologies. Likewise, the parties do not dispute that plaintiff was qualified to have her position upgraded to executive director of contracts and grants. With respect to the third element - whether plaintiff suffered an adverse employment action- the court will consider each of the alleged discriminatory actions.

1.      **Third Element - Adverse Events**

With respect to plaintiff's race and gender discrimination claims, plaintiff must show that she suffered an adverse employment action in order to succeed on her Title VII claims, as well as the section 1981 claims and the PHRA claims. The United States Court of Appeals for the Third Circuit has defined "an adverse employment action" under Title VII as "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Storey v. Burns Intern. Security Services, 390 F.3d 760, 764 (3d Cir.2004) (citing Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir.2001) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997)).

The court of appeals' definition stems from language found in Title VII, which provides:

> It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).  Accordingly, "[a]n adverse employment action may be a discharge or a failure to hire, or any action that alters an employee's compensation, terms, conditions, or privileges of employment." Robinson, 120 F.3d at 1300 (quoted in Collins v. Sload, 212 Fed.Appx. 136, 140 (3d Cir.2007)).  Adverse employment actions may include demotions, transfers to less desirable positions, and unsatisfactory job evaluations.  Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir.1993) (citing Shealy v. Winston, 929 F.2d 1009 (4th Cir.1991); Buckley v. Hosp. Corp. of Am., 758 F.2d 1525, 1530-31 (11th Cir.1985); Meyer v. Brown & Root Constr. Co., 661 F.2d 369 (5th Cir.1981); Muller v. U.S. Steel Corp., 509 F.2d 923 (10th Cir.); Junior v. Texaco, Inc., 688 F.2d 377, 380 (5th Cir.1982)).

Plaintiff asserts numerous adverse employment decisions and events[11] to be considered in the McDonnell Douglas framework.  According to plaintiff, there were a total of eleven adverse events that show discriminatory conduct: (a) the negative APA evaluation conducted by Blocksidge; (b) the assignment of Weir to Burzachechi instead of Johnson; (c) Johnson's duty to train Weir; (d) the college's refusal to upgrade Johnson to executive director; (e) the denial of promotion to interim vice president of Allegheny campus; (f) the denial of promotion to vice president of Allegheny campus; (g) the denial of promotion to dean of occupational technologies; (h) the negative APA evaluation conducted by Burzachechi; (i) Burzachechi's refusal to allow Johnson to attend a conference; (j) Blocksidge's refusal to allow Johnson to travel to Portugal; and (k) Johnson's termination.

---

11  Plaintiff states that these events show retaliatory or discriminatory conduct.  The same events are alleged for plaintiff's retaliation claims.

Each of the eleven discriminatory and retaliatory acts involved the actions of different individuals and warrants separate analysis concerning whether the particular act presents an adverse employment action. For each action, plaintiff must adduce evidence that a reasonable, objective person would find that action materially adverse to plaintiff. See Smith v. Potter, 04-881, 2007 WL 951440, *10 (W.D.Pa. Mar. 26, 2007)

### a. Blocksidge's Negative Review

The first alleged discriminatory action is Blocksidge's negative review of Johnson's performance. Blocksidge reviewed plaintiff in February 2004. In his review, Blocksidge rated plaintiff as earning a performance score of 3.6 out of 5. A rating of 3.6 falls within the "often beyond expectations" category. Plaintiff's performance rating did not negatively impact her salary or any other aspect of her employment. It is well settled that a satisfactory performance review, without more, is insufficient to constitute an adverse employment action. See Robinson, 120 F.3d at 1301 (cited in Collins v. Sload, 212 Fed.Appx. at 140): see also Meredith v. Beech Aircraft Corp., 18 F.3d 890 (10th Cir.1994) (satisfactory performance review that is lower than past reviews does not constitute adverse employment action). The court finds that no reasonable trier of fact could find this performance review was an adverse employment action under the third element of the prima facie case.

### b. Assignment of Weir to Burzachechi

The second alleged discriminatory action is the assignment of Weir to Burzachechi instead of Johnson. Johnson posits that this assignment was a materially adverse employment action. The record is clear that Burzachechi was in charge of the entire contracts and grants

department. Indeed, Johnson, as the director of contracts and grants, reported to Burzachechi. Weir's position as grants compliance officer was a newly created position. There is no evidence that the grants compliance officer position was created to report to the director of contracts and grants and that Johnson was stripped of this responsibility. Plaintiff did not produce any evidence that this reporting structure altered her compensation, terms, conditions or privileges of employment. By failing to produce evidence of a materially adverse action, plaintiff failed to demonstrate that she satisfied the third element of a prima facie case for this alleged discriminatory action. Plaintiff's claim is only supported by her feelings and beliefs which are subjective and not sufficient for summary judgment. Celotex, 477 U.S. at 322-23. The court finds, therefore, that no reasonable finder of fact could conclude that a reasonable worker in these circumstances would consider Weir's reporting to Burzachechi instead of plaintiff to be materially adverse or that it altered the employee's compensation, terms, conditions, or privileges of employment.

### c. Johnson's Duty to Train Weir

The third discriminatory action is Johnson's duty to train Weir. Weir testified that she and Johnson met weekly to discuss issues related to grants. (Weir Dep. at 82.) In these weekly meetings, Johnson would give Weir advice as needed. (Weir Dep. at 82.) Johnson, however, did not adduce evidence to show that she was required to train and did train Weir. The evidence of the possibility of weekly advice is not significantly probative of training to enable a reasonable jury to render a verdict in favor of plaintiff on this allegation. Anderson, 477 U.S. at 249-50. By failing to produce evidence of a materially adverse action, plaintiff failed to demonstrate that she satisfied the third element of a prima facie case for this alleged discriminatory action.

### d. Remaining Alleged Adverse Employment Actions

The fourth discriminatory action deals with the college's refusal to upgrade Johnson's position to executive director. The fifth discriminatory action involves the denial of a promotion to interim vice president. The sixth discriminatory action concerns the denial of a promotion to vice president of the Allegheny campus. The seventh discriminatory action deals with the denial of a promotion to dean of occupational technologies. The eighth discriminatory action involves the negative performance review given by Burzachechi, which ultimately affected plaintiff's salary. The ninth discriminatory action deals with Burzachechi's refusal to allow Johnson to travel to a conference. The tenth discriminatory action concerns Blocksidge's refusal to allow Johnson to travel to Portugal for the FIPSE meeting. The eleventh discriminatory action involves Johnson's termination. Viewing these actions in the light most favorable to plaintiff, the court concludes that these eight actions could be reasonably perceived as materially adverse actions and that plaintiff satisfied the third element of a prima facie case with respect to these claims.

### 2. Fourth Element - Similarly Situated Individuals

With respect to the fourth element of the prima facie case, plaintiff adduced evidence that during the time plaintiff sought an upgrade of her position, Caucasian individuals were upgraded to executive director positions at CCAC. Further, plaintiff applied for a promotion to be appointed as interim vice president of the college's Allegheny campus. Plaintiff was denied the position when the college appointed Todd, a Caucasian woman to fill the position. Next, plaintiff was denied a promotion to be appointed as the vice president of the college's Allegheny campus. Sutin, instead, promoted Brian Johnson, an African-American male, to the position.

It is irrelevant that one person in a protected class lost out to another person in a protected class. The key inquiry is whether she lost because of a decision based upon illegal discrimination. Cf. O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996) (cited with authority in Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 353-54 (1999) (applying the O'Connor court's reasoning in the context of gender and race discrimination claims under Title VII)). In O'Connor, a 56-year-old plaintiff was fired and claimed that his termination was because of his age in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. §§ 621 et seq. Id. at 309. The court of appeals concluded that since the plaintiff's replacement was forty years of age and within the protected age class, element four of the prima facie case was not met by the plaintiff. Id. at 310. The Supreme Court reversed the judgment of the court of appeals because the ADEA prohibits discrimination on the basis of age and not class membership. Id. at 313. The fact that a replacement was substantially younger than the plaintiff was "a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." Id.

In the instant case, the fact that the candidate chosen for the interim vice president position was a woman and that the candidate chosen for the vice president position was an African-American, does not weigh on the evaluation of plaintiff's claims. The prima facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion...." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 (1977). To fulfill the requirements of the fourth element of the prima facie case, a plaintiff must show by a preponderance of the evidence that under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications

similar to the plaintiff's qualifications to fill the open position. <u>McDonnell Douglas</u>, 411 U.S. at 802.

Plaintiff argues that Todd was not as qualified as plaintiff for the interim vice president position because she did not have the required qualifications for the position. It is undisputed that plaintiff was qualified for the interim vice president position. As Todd is Caucasian, plaintiff satisfied the fourth element with respect to her race discrimination claim relating to the college's refusal to appoint her as interim vice president.

With respect to the vice president position, the college hired Brian Johnson, an African-American male, for the position. It is undisputed that plaintiff was qualified for the vice president position but was not hired. Because Brian Johnson is a male and received the position, plaintiff adduced sufficient evidence to satisfy the fourth element of the prima facie case of discrimination.[12]

Lucas, instead of plaintiff, was internally transferred to the dean of occupational technologies position. Plaintiff asserts that this appointment was as a result of gender and racial discrimination. Although plaintiff does not allege that she was qualified for the dean of occupational technologies position, defendants do not dispute that plaintiff was qualified for the position. Viewing the facts in the light most favorable to the nonmoving party, for purposes of

---

12 In a footnote in the brief in support of defendants' motion for summary judgment, defendants argue that plaintiff failed to establish the elements of a "failure to hire" discrimination claim. Defs.' Brief at 18, n.21. For purposes of summary judgment, defendants appear to concede plaintiff's qualification with respect to the desired positions to the extent "CCAC's handling of these position raises an inference of discrimination." <u>Id.</u> The court will address these arguments in the context of a disparate treatment claim because plaintiff has not raised a "failure to hire" claim, either in her complaint or her briefing in opposition to defendants motion for summary judgment.

summary judgment, the court will assume that plaintiff satisfied the fourth element of a prima facie case with respect to her race and gender discrimination claims as they relate to the college's failure to appoint her as dean of occupational technologies.

It is undisputed that Burzachechi gave Johnson a negative performance evaluation. The negative performance evaluation, which rated plaintiff as performing "below expectations," negatively affected plaintiff's salary. Johnson asserts that Burzachechi was predisposed to disliking her and thinking that she was lazy. Although plaintiff argues that Burzachechi gave her a negative performance rating because of her race, she failed to point to any evidence relating to similarly situated employees' performance evaluations. Johnson failed to establish any evidence that Burzachechi treated her differently than all other employees. Plaintiff failed to establish the fourth element of a prima facie case with respect to her negative performance evaluation. Although plaintiff failed to adduce sufficient evidence with respect to her negative performance evaluation, the court will assume for argument purposes that she satisfied the fourth element in addressing this claim.

Burzachechi denied Johnson's request to attend a conference after Johnson's vacation. Defendants assert that Burzachechi denied Johnson the opportunity to attend the conference because Johnson failed to complete necessary work before going on a two-week vacation, causing significant problems in the contracts and grants department. Johnson claims, however, that another Caucasian employee was permitted to travel to conferences, despite concerns about her performance and abilities. Specifically, Johnson notes that Weir was permitted to travel to conferences despite Burzachechi's concerns about Weir's capabilities. Viewing the facts in the light most favorable to plaintiff, the nonmoving party, the court concludes that for purposes of

summary judgment, the fourth element of a prima facie case was satisfied by plaintiff relating to the denial of her request to attend a conference. Plaintiff presented sufficient evidence to support an inference that an employment decision may have been based on an illegal discriminatory criterion. This inference applies only to her race discrimination claims because the comparator-Weir-was a Caucasian female.

Plaintiff asserts that defendants discriminated against her by refusing her the opportunity to travel to the FIPSE meeting in Portugal. Plaintiff alleges that defendants withdrew the approval of her travel to the meeting and instead permitted a Caucasian male to travel to the meeting. Viewing the facts in the light most favorable to plaintiff, the court concludes that plaintiff has satisfied the fourth element of a prima facie case of discrimination with respect to the refusal of defendants to allow her to travel to Portugal.

Defendants assert that Johnson was terminated from her employment with CCAC because she did not return to work after the expiration of her FMLA leave. Plaintiff argues that Caucasian employees were granted extended leave and she was not given the opportunity to extend her leave because of her race and gender. Although Johnson's contentions are factually incorrect, as will be discussed more fully below, for purposes of summary judgment, the court will assume that plaintiff established the fourth element of a prima facie case of discrimination relating to her termination for failing to return to work.

### A. Burden Shifting - Defendants' Reasons

Since plaintiff presented sufficient facts to support a prima facie case – or the court assumed she did so – for eight of the alleged discriminatory actions, the court must address the burden shifting under the McDonnell Douglas framework. Once a plaintiff has established a prima facie

case the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for reasons that are legitimate and nondiscriminatory. Burdine, 450 U.S. at 254. An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); see St. Mary's Honor Ctr. V. Hicks, 509 U.S. 502, 509 (1993). It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers. Burdine, 450 U.S. at 254; see Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

In this case, defendant proffered reasons with respect to each of the eight adverse actions against plaintiff. With respect to defendants' refusal to upgrade Johnson's position to executive director, defendants argue that CCAC wanted to wait for a short period of time before upgrading plaintiff's position. Defendants also argue that the proposed upgrade was based upon plaintiff's assumptions and not upon the then current needs of the contracts and grants department.

With respect to defendants' failure to promote plaintiff to the interim vice president position, defendants assert that plaintiff and Todd were interviewed for the position. Defendants adduced evidence that Todd received a higher interview score than plaintiff following the interview process. With respect to the dean of occupational technologies position, defendants assert that CCAC hired Lucas for the position as a result of an internal transfer and in accordance with its policy permitting internal transfers without posting a position. Defendants state that, although plaintiff applied for the position, she was not a candidate.

Plaintiff asserts that CCAC discriminated against her when Burzachechi gave plaintiff a negative performance rating and refused to allow plaintiff to travel to a conference. Defendants assert, however, that plaintiff received a negative performance rating because she poorly performed on the HUD/COPC project, worked from home twice in direct contradiction to her supervisor's admonition regarding work from home and failed to understand her role within the contracts and grants department. As a result of plaintiff's poor performance, Burzachechi denied plaintiff's request to attend a conference. Burzachechi states that she denied the request because plaintiff was failing to perform adequately her work responsibilities at the time of the conference. Burzachechi's concerns regarding plaintiff's work performance were well documented. As a result of the concerns, Burzachechi gave plaintiff a negative performance rating and refused plaintiff the opportunity to travel to a conference.

With respect to plaintiff's travel to the FIPSE meeting in Portugal, defendants assert that plaintiff was denied the opportunity to travel because the Department of Education notified CCAC that the space was limited at the meeting. The Department of Education also informed CCAC that grant writers-like plaintiff-were not the intended participants at the FIPSE meeting. CCAC, therefore, notified plaintiff that she was not to attend the FIPSE meeting in Portugal.

Plaintiff alleges that CCAC discriminated against her when it terminated her employment for failing to return to work. Defendants assert, however, that plaintiff was terminated because she failed to return to work after her FMLA leave and, therefore, under CCAC's policies voluntarily terminated her position.

Plaintiff alleges that CCAC discriminated against her when it denied her a promotion to the vice president of the Allegheny campus position. The only defendant implicated in this claim is

49

CCAC. The individual defendants cannot be liable for this claim under Title VII. <u>Sheridan v. E.I. DuPont de Nemours and Co.</u>, 100 F.3d 1061, 1077-78 (3d Cir.1996) . With respect to the PHRA, plaintiff did not allege that the individual defendants aided and abetted CCAC with respect to this claim and, therefore, plaintiff did not assert a claim under the PHRA against the individual defendants. <u>Dici v. Pennsylvania</u>, 91 F.3d 542, 543 (3d Cir.1996). CCAC failed to proffer a legitimate nondiscriminatory reason why it hired Brian Johnson, a male, instead of plaintiff, a female. CCAC argues that plaintiff cannot use Brian Johnson as a comparator to establish her race discrimination claims because he, like plaintiff is African-American. CCAC failed, however, to address plaintiff's gender discrimination claims. CCAC's failure to proffer a legitimate nondiscriminatory reason with respect to why it hired a male instead of plaintiff necessitates that this court deny summary judgment in favor of CCAC with respect to this claim.

With respect to all plaintiff's other race and gender claims for which she satisfied the prima facie case, this court concludes that defendants met their relatively light burden to proffer legitimate nondiscriminatory reasons for the subject actions.

**C. Pretext**

The last part of the <u>McDonell Douglas</u> framework requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." <u>Fuentes</u>, 32 F.3d at 763. Once an employer has stated a

legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff, in order to survive summary judgment, must meet the two-prong test articulated by the United States Court of Appeals for the Third Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Id. at 764.

1.    Prong One

A plaintiff must submit evidence that could cause a reasonable factfinder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring her case to trial. To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995), nor produce additional evidence beyond her prima facie case. Fuentes, 32 F.3d at 764. The plaintiff must, however, demonstrate:

> "weaknesses, implausibilities, inconsistencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence'" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting [Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)]).

Simpson, 142 F.3d at 644.

The question asked in prong one of the <u>Fuentes</u> test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. <u>Keller v. ORIX Credit Alliance</u>, 130 F.3d 1101, 1109 (3d Cir. 1997).

An employment decision that would create a problem under prong one will likely turn on whether the stated reason for termination is so implausible that a factfinder could not believe it to be worthy of credence. For example, in <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326 (3d Cir. 1995), the plaintiff was fired due to deficient sales performance. The evidence of record, however, disclosed that the plaintiff received a bonus three months prior to his termination and that he was the only employee in his region to have received such a bonus. The court held that, where the primary measure of the employee's performance was his sales, and where he was the leading salesperson in the region, the employer's stated reason for his termination was "contradictory to [its] admission that the most important standard of job performance is sales." <u>Id.</u> at 332. According to the court, "[a] factfinder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program – sales." <u>Id.</u>

<u>Sempier</u> is another case in which an employer stated the plaintiff was terminated because of poor performance causing the company to restructure the nature of his responsibilities. The evidence of record, however, disclosed that (1) the plaintiff never received any unfavorable criticism that his performance was poor or inadequate; and (2) the employer failed to produce any other evidence of poor performance or to make specific allegations of the plaintiff's

deficiencies. <u>Sempier</u>, 45 F.3d at 731-33. Thus, there was evidence on the record that a reasonable factfinder could conclude that the reason given in <u>Sempier</u> by the employer was a pretext for age discrimination. <u>Id.</u> at 732-733.

In the instant matter, with respect to the college's refusal to upgrade Johnson's position, the record reveals that when Sutin tentatively approved the upgrade, he was working under the misconception that Blocksidge approved of the proposed upgrade. Plaintiff adduced no evidence that Blocksidge had approved the requested upgrade. Blocksidge believed that plaintiff had inaccurately represented her job functions and responsibilities. Blocksidge and Shader believed that plaintiff's request to upgrade her position largely was based upon assumptions about how the contracts and grants department may be restructured. After performing a review of positions similar to Johnson's at eight or nine other colleges and universities, Shader concluded that Johnson's position was the appropriate grade. Shader concluded that it would be more appropriate to wait and see how the restructuring would affect the contracts and grants department before upgrading plaintiff's position. Forty-five Caucasian directors were not upgraded to executive director positions. Although plaintiff contends that there are a number of inconsistencies surrounding defendants' refusal to upgrade her position, making defendants' proffered reasons implausible and not deserving of credence, the record evidence does not support plaintiff's assertions. No reasonable finder of fact could conclude that plaintiff met prong one with respect to this claim relating to CCAC's refusal to upgrade plaintiff's position.

With respect to the interim vice president position, both Johnson and Todd were interviewed for the position. An interview committee scored both individuals based on their respective performances during the interview. The interview committee gave Johnson a score of

173 and Todd a score of 244. The position was awarded to Todd because she had a substantially higher interview score. Plaintiff failed to adduce evidence to show that the scores were not objective indicators. Plaintiff argues that Todd was not qualified for the interim vice president position. Plaintiff, however, does not point to any evidence of record relating to either Todd or plaintiff's qualifications with respect to the interim vice president position. Plaintiff arguments are based on mere beliefs or gut feelings and are insufficient for a reasonable finder of fact to conclude that she meet prong one with respect to this claim relating to CCAC's failure to promote plaintiff to the interim vice president position.

With respect to the dean of occupational technologies position, CCAC appointed Lucas instead of plaintiff to that position. Defendants assert that this position was not open to applicants, but was an internal transfer. Defendants appointed Lucas to the position in accordance with its policy, which permits the college president to waive job posting requirements for administrative positions that are filled with internal transfers. Pursuant to this policy, Lucas was transferred to the dean of occupation technologies position. Plaintiff was never considered for this position. Plaintiff points to no inconsistencies that rebut defendants' proffered reason for Lucas's appointment, and, thus, failed to show that defendants' reasons are pretext for discrimination. Although plaintiff asserts that defendants discriminated against her by not appointing her to the position, plaintiff failed to adduce any evidence to that effect. Plaintiff did not establish either the requirements for that position or that she was as or more qualified than Lucas. Because plaintiff failed to adduce any evidence that defendants' proffered reason for appointing Lucas to the dean of occupational technologies position lacks credence, this court concludes no reasonable finder of fact could conclude that she met prong one with respect to this

claim relating to CCAC's failure to appoint plaintiff to the position of dean of occupational technologies.

Plaintiff also argues that defendants discriminated against her when Burzachechi gave her a negative performance review. Plaintiff contends that Burzachechi was predisposed to see Johnson as troublesome and lazy. There is no record evidence, however, that Burzachechi held this belief. The evidence shows that Burzachechi treated all her direct reports in the same strict manner as she treated Johnson. While this court recognizes that Burzachechi's style, which included micro-managing her employees, may have been an annoyance and burdensome to plaintiff, the record is clear that Burzachechi's management style applied evenly to all of her direct reports, regardless of the employees' race or gender. To that end, when plaintiff failed to meet Burzachechi's demands, Burzachechi evaluated plaintiff's performance in the same strict manner. Despite plaintiff's beliefs, Burzachechi's evaluation of plaintiff was based upon 1) the poor performance of plaintiff with respect to the HUD/COPC grant; 2) plaintiff leaving a HUD/COPC meeting early to work at her part-time employment; 3) plaintiff leaving for vacation without completing necessary work assignments, which necessitated Burzachechi prematurely ending her vacation to address the incomplete work; 4) plaintiff twice working from home despite Burzachechi's denial of her request to do so; and 5) the failure of plaintiff to understand and appreciate her position as director of contracts and grants and her role within CCAC's structure. Burzachechi's negative performance evaluation of plaintiff's job performance came after several complaints regarding plaintiff's work. Plaintiff failed to present sufficient evidence to show the implausibility of defendants' stated reason for her negative APA. No reasonable

finder of fact could conclude that plaintiff met prong one with respect to her claim relating to Burzachechi's negative performance rating.

After Johnson returned from her vacation, Burzachechi denied her request to attend a conference because Johnson had been off of work for two weeks and had shown an inability to manage her current workload. Johnson argues that Weir, who is a Caucasian female, was permitted to travel to conferences and the fact that plaintiff was not is an indication that defendants discriminated against her. Burzachechi, however, was clear about why Johnson was denied the opportunity to attend a conference. Specifically, Burzachechi stated that Johnson had failed to perform satisfactorily her duties with respect to the HUD/COPC grant. Johnson's performance on that project was such that Proctor, an African-American male, repeatedly complained to Burzachechi about Johnson. Proctor stated that Johnson failed to provide critical information and complete necessary tasks on that project. In addition, while Johnson was on vacation, Burzachechi received complaints about Johnson's performance on other projects. The complaints were so serious that Burzachechi prematurely ended her vacation and returned to work to handle Johnson's projects. Burzachechi believed that Johnson was floundering in her current position and could not justify sending Johnson to a conference, requiring her to miss additional days off work. Despite Johnson's arguments she failed to point to any evidence in the record that similar complaints had been made about Weir and this did not establish weaknesses or inconsistencies in defendants' proffered reasons for denying her travel to the conference. No reasonable finder of fact could conclude she met prong one with respect to her claim relating to a denial of the opportunity to attend a conference.

Defendants advanced a legitimate business reason for refusing to allow Johnson to travel to Portugal for the FIPSE meeting. Defendants asserted that Frankfurt, an employee from the Department of Education, indicated that there was a lack of space at the FIPSE meeting and that only one individual from CCAC could attend. Frankfurt advised Lowe that he had previously informed Johnson that she should not attend the meeting. Frankfurt indicated that Johnson, as a grant writer, was not the intended participant in that specific meeting. Plaintiff failed to adduce any evidence that defendants' legitimate, nondiscriminatory reason for refusing to allow her to travel to the FIPSE conference in Portugal was pretextual. No reasonable finder of fact could conclude that plaintiff met prong one with respect to her claim relating to the refusal to allow her to attend the meeting in Portugal.

With respect to plaintiff's termination, defendants assert that plaintiff was terminated in accordance with CCAC policy when she failed to return to work after the expiration of her FMLA leave. The policy, which provided for twelve weeks of leave, was provided to Johnson. She was aware through the policy and through the letters sent by CCAC that she would be terminated if she did not return at the end of her leave. Plaintiff insists that there are inconsistencies surrounding her termination, including the assertion that no one individual took responsibility for terminating Johnson's employment. It is undisputed that CCAC's FMLA policy, which was provided to Johnson at the beginning of her FMLA leave, stated that if she did not return after the expiration of her FMLA leave, her employment would be considered voluntarily terminated. Despite Johnson's assertion of inconsistencies, the FMLA policy is clear and was provided to Johnson at the beginning of her FMLA leave. Although the record does not identify the individual who made the decision to send a termination letter to Johnson, no

reasonable finder of fact could conclude that Johnson's termination in accordance with CCAC's existing FMLA policy was pretextual.

The court finds that plaintiff failed to present sufficient evidence to allow a reasonable jury to conclude that "a discriminatory reason more likely motivated the employer" than the employer's proffered explanations for the race and gender discrimination claims discussed above. Burdine, 450 U.S. at 256. Plaintiff did not succeed in adducing evidence of record that the employer's proffered reasons for those actions were "unworthy of credence." Id. Plaintiff presented insufficient evidence to demonstrate weaknesses, implausibilities, inconsistencies or incoherencies in defendants' proffered reasons. Plaintiff cannot satisfy her burden of proving that defendants' reasons with respect to those actions were pretextual under the first prong of the Fuentes test.

### 2. Prong Two

The court must next examine the second prong of the Fuentes framework to determine if plaintiff presented sufficient evidence of pretext. To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that could allow a factfinder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision. Simpson, 142 F.3d at 644-45. Relevant evidence that could be relied on in the evaluation of this prong includes: (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people within the plaintiff's protected class or within another protected class, or (3) whether the employer has treated more favorably similarly situated persons not within the protected class. Id. at 645.

a. **Whether the employer previously discriminated against plaintiff**

While Johnson believed that Burzachechi discriminated against her, there is no record evidence to support this contention. Johnson and Weir both reported directly to Burzachechi. Although Burzachechi expressed concerns about Johnson's work ethic, she made similar comments about Weir. Further, Burzachechi placed the same demands on all her employees without regard to race or gender. Both Weir and Johnson were required to turn in weekly calendars and document their time. There is no evidence that defendants previously discriminated against Johnson. No reasonable finder of fact could conclude that CCAC previously discriminated against her.

b. **Whether the employer has discriminated against other people within plaintiff's protected class or another protected class**

Plaintiff alleges that CCAC has a history of discriminating against people within her protected class. Johnson asserts that the Black Caucus viewed CCAC's hiring practices as discriminatory. Johnson offers the statement of Hubbard, an African-American female, who believed that she was treated unfairly by CCAC to support her position that CCAC previously discriminated against other people within plaintiff's protected class.

This court's decision must be based on the evidence of record, not mere beliefs and opinions. Jones, 198 F.3d at 413. The record evidence indicates that during Sutin's tenure, the time period in question, a total of sixteen administrative appointments were made. Of those appointments, 50% were filled by women and 38% by minorities. Although Johnson refutes the accuracy of this information, she has not proffered evidence showing that African-Americans or women were less favorably treated. In her affidavit, Johnson stated that "[t]he male administrators in the Black Caucus who complained, as well as Ralph Proctor, a faculty member

were all promoted." (Johnson Aff. ¶ 158.)  This evidence asserted by plaintiff contradicts her assertions of race discrimination.

With respect to plaintiff's gender discrimination claim, plaintiff relies solely on Hubbard's asserted experiences with CCAC.  Johnson argues that Hubbard's experiences suggest a history of past gender discrimination.  The trouble with plaintiff's assertion is that she presented no evidence to support either her opinion or Hubbard's opinion.  Throughout the record, there are any number of instances where females have been promoted, including African-American females.   Todd, Caucasian female, was promoted to vice president of the Allegheny campus.  Lorraine Johnson, an African-American female, who worked directly for defendant Shader was promoted to labor relations administrator.  Similarly, Simpson/Walton, an African-American female, was promoted within the grants department to senior secretary and reported directly to Burzachechi, a female.  Plaintiff suggests that being an African-American woman is membership in its own protected class.  Plaintiff cites no decision in support of this proposition and the court has been unable to locate any caselaw support plaintiff's position.  There is insufficient evidence that CCAC has unfavorably treated women or African-Americans.  Plaintiff's assertions are based on her beliefs and not evidence of record and this court cannot find that a reasonable finder of fact could render a verdict in favor of plaintiff for this claim.

### c.     <u>Whether the employer has treated more favorably similarly situated persons not within the protected class</u>

Plaintiff failed to adduce sufficient evidence to establish that CCAC treated more favorably similarly situated person not within the protected class.  With respect to Burzachechi, there is no evidence that she treated Johnson differently than her Caucasian direct report.  Burzachechi required all employees to keep the same hours and comply with her schedule

demands.  Johnson asserts that only white directors were upgraded to the executive director position.  Defendants submitted evidence, however, that forty-five Caucasian directors were denied executive director status.  Plaintiff did not contest that evidence.  Plaintiff also acknowledged that African-American male administrators, like Proctor, were promoted.  This court must conclude that based upon the record, Caucasian employees were not treated more favorably than similarly situated persons in plaintiff's protected class.


**D..     Conclusion With Respect to Race and Gender Discrimination Claims**

Plaintiff presented insufficient evidence of discrimination against her relating to the failure of CCAC to upgrade or promote her to the positions of executive director, interim vice president and dean of occupational technologies, Burzachechi's negative APA appraisal, the refusals to allow plaintiff to attend a conference and to travel to Portugal and Johnson's termination for failure to return to work after her FMLA leave.  "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate non-discriminatory reasons for an adverse employment action."  Orenge v. Veneman, 218 F.Supp.2d 758, 765 (D. Md. 2002).  Based upon the undisputed evidence of record, viewing all disputed facts in favor of plaintiff, and drawing all reasonable inferences in favor of plaintiff, the court concludes that a reasonable jury could not render a verdict in favor of plaintiff with respect to her claims of race and gender discrimination and summary judgment must be entered in favor of defendants on these claims.  This conclusion, however, does not apply to plaintiff's claim of gender discrimination against CCAC relating to the failure to promote her to the position of vice

president of the Allegheny Campus. With respect to that claim, CCAC did not proffer a reason why Brian Johnson, a male, was appointed rather than plaintiff.

## II.    Title VII Retaliation Claim[13]

In order to establish a prima facie case of retaliation, plaintiff must demonstrate that: (1) she engaged in protected activity; (2) her employer took adverse action after or contemporaneous with her protected activity; and (3) a causal link exists between her protected activity and the employer's adverse action. Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 286 (3d Cir. 2001). The first element of the prima facie case requires, at the very least, an informal protest of discriminatory employment practices. Barber v. CSX Dist. Services, 68 F.3d 694, 701-02 (3d Cir. 1995) (citing Summer v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)). The protest, in whatever medium, must specifically relate to the protected conduct allegedly being infringed. Barber, 68 F.3d at 701.

### A.  Protected Activity

In this case, plaintiff asserts that the statements she made as a member of the Black Caucus were protected statements. These statements conveyed the belief that CCAC was engaging in discriminatory employment practices in the manner in which college employees were hired and promoted. The record reflects that the Black Caucus' complaints began in May 2003. The record also reflects that Johnson complained of racial discrimination to Sutin in the fall of 2003, on August 17, 2004 when she informed CCAC of her medical leave, and on

---

13  Retaliation claims under the PHRA are analyzed under the same standard as a Title VII retaliation claim. The disposition of the Title VII claims will be applicable to the PHRA claims. Marra v. Phila. Hous. Auth., 497 F.3d 286, 301 (3d Cir.2007).

October 25, 2004, when she filed a discrimination claim with the EEOC. Plaintiff, thus, satisfied the first element of the prima facie case with respect to her retaliation claims.

**B.  Adverse Action**

In 2006, the Supreme Court in <u>Burlington Northern & Santa Fe Railway v. White</u>, 548 U.S. 53, 67-68 (2006), clarified what is required to pursue a retaliation claim for a protected activity, illuminating in particular what is required to meet the second element of the prima facie case - proof that an employer took an "adverse employment action" against the plaintiff. The Court explained that in order to state a retaliation claim, a plaintiff must show that a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Id.</u> at 68 (internal quotation marks omitted). A plaintiff may meet her burden by demonstrating that her employer's conduct is "likely to deter victims of discrimination from complaining to the EEOC." <u>Id.</u> (internal quotation and citation omitted). The Court carefully distinguished "material adversity" from "trivial harms" and further reiterated that Title VII does not set forth an American workplace civility code. <u>Id.</u> "[P]etty slights, minor annoyances, and simple lack of good manners" are normally not sufficient to deter a reasonable person. <u>Id.</u>

The Court clarified that the material adversity of an action should be determined by an objective standard. <u>Id.</u> ("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective.") (emphasis in original). The Court further indicated that determining whether an action is materially adverse requires a fact intensive inquiry and an analysis of the totality of the circumstances. The appropriate analysis

inquires into what would be an objective person's reaction based upon a particular set of factual circumstances:

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."

Id. (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81-82 (1998)).

As stated above, the court will accept for purposes of summary judgment, that the following actions constitute adverse actions for purposes of plaintiff's prima facie case, (1) the college's refusal to upgrade Johnson to executive director; (2) the denial of promotion to interim vice president of Allegheny campus; (3) the denial of promotion to vice president of Allegheny campus; (4) the denial of promotion to dean of occupational technologies; (5) the negative APA evaluation conducted by Burzachechi; (6) Burzachechi's refusal to allow Johnson to attend a conference; (7) Blocksidge's refusal to allow Johnson to travel to Portugal; and (8) Johnson's termination. Plaintiff, therefore, has satisfied the first two elements of this retaliation claim. The dispute with respect to plaintiff's retaliation claims, thus, turns on whether plaintiff can demonstrate a causal link between her protected activity and the adverse actions taken by defendants.

Defendants contend that there is no evidence that the individual defendants knew Johnson was involved in the Black Caucus and, therefore, it is impossible that any adverse act was causally connected to her protected activity. Johnson contends that it is of no consequence

whether Blocksidge, Burzachechi, and Shader knew she was a member of the Black Caucus because their knowledge that she participated in opposition to discriminatory practices could be inferred and is a matter of credibility.

With respect to plaintiff's statements made as a member of the Black Caucus, each of the individual defendants denies knowledge that plaintiff was a member of the Black Caucus. Although plaintiff states that she believes that the individual defendants had knowledge of her protected activity and refers to email messages that were sent to some CCAC employees on behalf of the Black Caucus, she has not adduced probative evidence to support her belief that they had knowledge of her membership or of the statements she made as a member. To find in plaintiff's favor would require a juror to speculate that at least one of the individual defendants read the emails, which do not directly implicate plaintiff's activities or statements. Plaintiff disputes the denials by defendants that they had knowledge of the protected activity. "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." Orenge v. Veneman, 218 F.Supp.2d at 765 (quoting Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989)(citing Gairola v. Virginia Dep't of Gen. Servs., 753 F.2d 1281, 1288 (4th Cir. 1985)). Since Johnson's retaliation claims are only supported by her feelings and beliefs, which are subjective matters requiring speculation, a reasonable jury could not render a verdict in her favor on these claims. Celotex, 477 U.S. at 322-23. Under those circumstances, summary judgment must be granted in defendants' favor on the retaliation claims.

## III.    Hostile Work Environment Claim

The hostile work environment claim had its genesis in <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57 (1986), in which the United States Supreme Court recognized that sexual harassment was actionable under Title VII.  In that case, the Court indicated that two types of sexual harassment claims existed under Title VII: (1) a claim based upon a *quid pro quo* arrangement; and (2) a claim based upon an intimidating, hostile, or offensive work environment.  <u>Id.</u> at 66.  The latter claim, more commonly known as "hostile work environment" claim, was refined in the wake of <u>Meritor</u> to cover other types of discrimination claims as well, including claims of a racially hostile work environment.  <u>See</u> <u>Faragher v. Boca Raton</u>, 524 U.S. 775, 786-87 (1998).   An actionable claim of a hostile work environment requires the plaintiff to demonstrate "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee."  <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1482 (3d Cir. 1990) (emphasis in original).  To be ultimately successful on a claim of hostile work environment, the plaintiff must demonstrate that the harassment was severe or pervasive to such a degree that the harassment altered the terms and conditions of employment.  <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 752 (1998).

The following five elements must be established by a plaintiff bringing a hostile work environment claim pursuant to Title VII: (1) the plaintiff suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex or race in that position; and (5) there is a basis for vicarious liability.  <u>See</u> <u>Andrews</u>, 895 F.2d at 1482; <u>see also</u> <u>Cardenas v. Massey</u>, 269

F.3d 251 (3d Cir. 2001); <u>Aman v. Cort Furniture</u>, 85 F.3d 1074, 1081 (3d Cir. 1996); <u>West v. Philadelphia Elec. Co.</u>, 45 F.3d 744, 753-54 (3d Cir. 1995). The determination whether a Title VII plaintiff is able to establish each of the elements of a hostile work environment claim is a fact-intensive inquiry into the "overall scenario" in which the alleged harassment occurred. <u>Cardenas</u>, 269 F.3d at 261 (3d Cir. 2001). "The Supreme Court has cautioned that 'conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.'" <u>Newring v. PNC Corp.</u>, No. 01-1973, 2006 WL 840347, *7-8 (W.D. Pa. Mar. 29, 2006) (quoting <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21, (1993) (citing <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. at 67)).

Plaintiff alleges that defendant Burzachechi maintained a racially hostile work environment aimed at plaintiff which altered the condition of the workplace by creating an objectively abusive and hostile atmosphere. In plaintiff's brief in opposition to defendants' motion for summary judgment, however, plaintiff failed to address this claim. Defendants argue that plaintiff failed to present any evidence concerning Burzachechi's management style and requirements to establish a hostile work environment claim. This court agrees.

There is no probative evidence of the first element of the prima facie case. Here, there was no showing that Burzachechi intentionally discriminated against Johnson because of her membership in a protected class. Plaintiff failed to present evidence that Burzachechi treated Johnson differently from any of her other direct reports. The record reflects that Burzachechi required both Johnson and Weir, a Caucasian female, to submit weekly schedules, to maintain regular office hours, to refrain from working from home, and to document their time.

Burzachechi's practice of documenting performance issues in memoranda forwarded to the human resources department was not unique to Johnson.  See Burzachechi Dep. at 300-03. Burzachechi restricted email access to other employees, other than Johnson, who were on medical leave.  There is also no evidence that Burzachechi had a racial motive when she changed the locks to Johnson's office after hearing of missing files, and no evidence that Johnson was subject to racially motivated insults, ridicule, or epithets.  Any criticism received by Johnson followed complaints made about her work performance, which included complaints made by Proctor, an African-American.  Additionally, there was no evidence presented that the change in work schedule and the denial of business trips were racially motivated abuse.  Plaintiff failed to present sufficient evidence from which a reasonable jury could conclude that she was intentionally discriminated against by reason fo her membership in a protected class.  Under these circumstances, summary judgment must be granted in defendants' favor on plaintiff's hostile work environment claim.

## IV.     FMLA Claim

### A.  General

The FMLA was enacted by Congress in 1993, in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods."  29 U.S.C. § 2601(a)(4).  The act was designed to provide a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and "accommodat[ing] the legitimate interests of employers."  29 U.S.C. §§ 2601(b)(1-2); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. § 2601(b)(1)) (holding that one of  "[t]he primary purposes of the FMLA [is] to 'balance the

demands of the workplace with the needs of families'. . . ."). The FMLA grants eligible

employees the right to take up to twelve work weeks of leave during a twelve-month period for

any of the following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
>
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.
>
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
>
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(A-D). At the end of the leave period, the employee has the right to be

restored to her former position or an equivalent position. 29 U.S.C. § 2614(a)(1).

An eligible employee[14] under 29 U.S.C. § 2612(a)(1)(C) or (D) may be entitled to

take FMLA leave intermittently

> on a reduced schedule when medically necessary. The taking of leave intermittently or on a reduced leave schedule . . . shall not result in a reduction in the total amount of leave to which the employee is entitled . . . beyond the amount of leave actually taken.

29 U.S.C. § 2612(b). The phrase "intermittent leave" is defined under the implementing

regulations as "leave taken in separate periods of time due to a single illness or injury, rather

than for one continuous period of time, and may include leave of periods from an hour or more

to several weeks." 29 C.F.R. § 825.800.

---

14 The FMLA defines an "eligible employee" as one who has been employed for at least twelve months by the employer and for at least 1,250 hours during the previous twelve-month period. 29 U.S.C. § 2611(A). Both parties agree that plaintiff is an eligible employee under the FMLA.

## B.  **FMLA Interference claim**

Under the FMLA, "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).  In order for a plaintiff to establish a claim for an interference of FMLA rights, "the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." Callison, 430 F.3d at 119.

"Courts have refused to recognize a valid claim for interference in the absence of any injury."  Alfiano v. Merck & Co.,175 F.Supp.2d 792, 794 (E.D.Pa. 2001)(citing Voorhees v. Time Warner Cable Nat'l Div., No. 98-1460, 1999 U.S. Dist. LEXIS 13227 (E.D. Pa. 1999); Fry v. First Fidelity Bancorp., No. 95-6019, 1996 U.S. Dist. LEXIS 875 (E.D. Pa. 1996)).  The scope of what constitutes interference is described in the applicable regulations as follows: "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).

To state a claim for interference under the FMLA, a plaintiff must show that: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.  Lombardo v. Air Products and

Chemicals, Inc., No. 06-1120, 2006 U.S. Dist. LEXIS 46077 at *11 (E.D. Pa. July 7,

2006)(citing Weisman v. Buckingham Twp., No. 04-4719, 2005 U.S. Dist. LEXIS 11696 at *11

(E.D. Pa. June 14, 2005)).

Pursuant to FMLA regulations, an employee must give an employer notice that he or she

needs to take FMLA leave.  29 C.F.R. § 825.302; Wilson v. Lemington Home for the Aged, 159

F.Supp.2d 186, 191 (W.D. Pa. 2001).  If the leave is foreseeable, the employee must provide

thirty days' notice.  Id.  If thirty days' notice is not possible, then notice must be given "as soon

as practicable."  Id.  An employee need not specifically mention the FMLA or assert rights under

it to satisfy the notice requirement.  29 C.F.R. § 825.302(c); Wilson, 159 F.Supp.2d at 192.  The

employee need only state that leave is needed.  Id.

In Sommer v. The Vanguard Group, 461 F.3d 397 (3d Cir. 2006), the court of appeals

noted:

> [T]he FMLA declares it "unlawful for any employer to interfere with,
> restrain, or deny the exercise of or the attempt to exercise, any right
> provided" in the FMLA.  § 2615(a)(1).  Such a claim is typically referred
> to as an "interference" claim, and is acknowledged to "set floors for
> employer conduct."  Callison v. City of Philadelphia, 430 F.3d 117,119
> (3d Cir. 2005).

Id. at 399.  "After an eligible employee returns from an FMLA leave, the employee is entitled to

be reinstated to his or her former position, or an equivalent one."  Conoshenti v. Public Serv.

Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004)(citing 29 U.S.C. § 2614(a)(1)).  "If the

employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA. . . ." 29 C.F.R. § 825.214(b). In other words, the FMLA does not require "an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave." Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002).

Plaintiff adduced prima facie evidence of elements one through four of an interference claim. With respect to the first and second elements, there is no dispute that plaintiff was an eligible employee under the FMLA and that defendant was an employer subject to the FMLA's requirements. With respect to the third element, it is clear that plaintiff was entitled to FMLA leave as CCAC, on its own initiative, designated plaintiff's leave as FMLA leave. Similarly, there is no issue with the fourth element, as notice of the employee's intent to take leave need not be expressed by the employee specifically as FMLA leave and it is not contested that plaintiff indicated in her email to Shader that, at her doctor's direction, she would be taking medical leave.

The court notes that the FMLA generally requires an employee to give notice thirty days before taking FMLA leave. In this case, however, the plaintiff's leave, which began on August 17, 2004, was not designated as FMLA leave until October 25, 2004, more than thirty days later. Additionally, it was at the direction of CCAC that plaintiff's leave after October 25,

72

2004 was designated as FMLA leave.

The fifth element for a prima facie claim of interference under the FMLA requires closer analysis by this court. In order to establish the fifth element for a prima facie case of interference under the FMLA, plaintiff must show that she was denied a benefit to which she was entitled under the FMLA. Specifically, the FMLA states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Plaintiff's argument that CCAC interfered with her right to take intermittent leave, thereby denying her a benefit to which she was entitled, relies on holdings in Conoshenti and Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002). Neither decision, however, supports plaintiff's argument.

In Conoshenti, the United States Court of Appeals for the Third Circuit held that "the DOL's regulations impose upon the employer obligations to communicate with employees regarding their rights under the FMLA. In particular, the regulations require employers to provide employees with individualized notice of their FMLA rights and obligations." Conoshenti, 364 F.3d at 142. There the court found that a defendant violated the FMLA because it failed to advise Conoshenti of his right to twelve weeks of leave under the FMLA. Id., at 142-143. Similarly, in Ragsdale, the United States Supreme Court found that failure to give an employee the required notice could be said to deny, restrain, or interfere with the employee's right to take intermittent leave. Ragsdale, 535 U.S. at 89-90.

Here, once CCAC had determined that plaintiff's leave was to be designated as FMLA leave, the college's policy pertaining to FMLA leave was mailed to plaintiff and included information regarding intermittent leave. Plaintiff does not dispute that CCAC provided her with notice of her FMLA rights, including the right to take intermittent leave. (J.S. ¶¶ 127-30.) In situations where courts have found that notice was not sufficiently individualized, the notice information generally was indirectly provided. See Schmidt v. Mercy Hosp. of Pittsburgh, No. 05-1446, 2007 WL 2683826, *4 (W.D. Pa. 2007) (a defendant argued that the defendant provided the plaintiff with notice of her FMLA rights through its posting of its FMLA policy, its FMLA packet which was available in the human resources department and the defendants' intranet site and because the FMLA policy was discussed during the plaintiff's new hire orientation; the court, however, concluded that material issues of fact existed with respect to whether the defendant provided the plaintiff with sufficient individualized notice of her FMLA rights.). In contrast, here, a copy of the FMLA policy was mailed directly to plaintiff's home, the receipt of which plaintiff acknowledges. This notice can hardly be argued to provide less than "individualized notice."

Plaintiff alleges that CCAC denied her the benefit of the possibility of intermittent leave in the August 27, 2004 letter which stated:

> You have been absent from work since August 17, 2004, and you received faxed copies of worker's [sic] compensation forms from Randy Gaab to fill out and

> submit.  Before you can return to work, you must submit a full medical release
> that you are able to return to your position full-time with no limitations.

Defs'. Ex. 73 (emphasis added).  The letter, plaintiff claims, precluded the possibility of a return

to work part-time or in an intermittent capacity before any FMLA rights notice had been

received.  Plaintiff's reliance on a letter referencing plaintiff's workers' compensation claim in

an effort to support her claim under the FMLA misses the relevant issue.

At the time of that letter, plaintiff had not been placed on FMLA leave.  Plaintiff, at that

time, was pursuing a workers' compensation claim, forms for which had been sent to plaintiff

and were referenced in the letter.  It was not until October 25, 2004 that CCAC designated

plaintiff's leave as FMLA leave, at which time CCAC provided plaintiff with its policy on

FMLA leave.  No communication took place between plaintiff and CCAC, prior to October 25,

2004, with respect to FMLA leave, nor had plaintiff discussed FMLA leave with her doctors.

Once informed that CCAC had designated plaintiff's leave as FMLA leave, plaintiff responded

that she had not applied for FMLA leave and CCAC should not assume plaintiff agreed with the

classification.  (Defs'. Ex. 78.)

In all, plaintiff's unclassified leave, followed by the leave specifically designated as

FMLA leave, amounted to more than twenty-one weeks away from work.  The time off prior to

October 25, 2004 did not count against plaintiff's FMLA leave time and in no way prejudiced

her ability to receive a full twelve weeks of FMLA leave, including intermittent leave.  Once

plaintiff's leave was designated as FMLA leave, plaintiff received notice of the policy, which included the right to take intermittent leave. Plaintiff never sought intermittent leave and received the full twelve weeks of leave guaranteed by the FMLA.

Plaintiff asserts that the letter of October 25, 2004, which designated plaintiff's leave as FMLA leave, "could have" directed plaintiff that the earlier letter requiring a return to work full time with no limitations was not intended to preclude intermittent leave. Plaintiff, however, ignores the language of the FMLA policy which references the intermittent leave. No decisions were cited by plaintiff to support her argument. This court concludes that no reasonable finder of fact could find that based upon the evidence of record, the August 27, 2004 letter referencing plaintiff's workers' compensation claim was sufficient to establish a violation under the FMLA.

In plaintiff's amended brief in opposition to defendants' motion for summary judgment, plaintiff raises additional claims of interference with her FMLA rights that were not raised in her complaint. Plaintiff asserts that: (1) CCAC miscalculated her FMLA leave by improperly counting the time between Christmas and the New Year, at which time the college was closed; (2) CCAC did not provide her with the requisite sixty-day notice of a change in the college's FMLA policy, where the new policy used a different formula to count the leave time available to the employee; (3) CCAC failed to inform her of the amount of leave time available to her; and (4) CCAC, in the January 3, 2005 letter, which required two weeks' notice before returning to work, imposed impossible requirements not mandated by the FMLA. To raise these claims for

the first time in her opposition brief is procedurally inappropriate. It is well settled that the court need not consider these additional claims. See Aldinger v. Spectrum Control, Inc., 207 Fed. Appx. 177, 180 n.1 (3d Cir. 2006) (district court refused to address the plaintiffs' claim that defendant violated the WARN Act by failing to give notice of termination because that issue was raised for the first time in plaintiffs' brief in opposition to the defendant's motion for summary judgment and was not pleaded in their complaint); Miklos v. Principi, No. 01-CV-0303, 2006 WL 240648, *12 (W.D. Pa. 2006) (instances of alleged retaliation discussed in the plaintiff's opposition brief were not raised in the amended complaint and consequently deemed not part of the instant lawsuit); Dogmantis v. Capital Blue Cross, 413 F.Supp.2d 452, 458 n.1 (E.D. Pa. 2005) (because additional claims were not properly pleaded in the plaintiff's amended complaint, they were deemed are not before the court); see also Garcia v. Henry Street Settlement, 501 F.Supp.2d 531, 543 (S.D. N.Y. 2007) (a plaintiff's claim, raised for the first time in the opposition brief, was dismissed because nothing in the complaint would reasonably have led the EEOC to "investigate, mediate, [or] take remedial action" and was therefore procedurally inappropriate). Even if those additional claims were procedurally proper, plaintiff's additional FMLA claims necessarily fail because even assuming plaintiff could meet the first element for each FMLA claim, plaintiff is unable to show that she was prejudiced.

Plaintiff acknowledged that she received twelve weeks of FMLA leave from CCAC. In fact, plaintiff's total leave from work amounted to approximately twenty-two weeks. Plaintiff

acknowledged that at the conclusion of the twelve weeks, which were specifically designated as FMLA leave, she was not able to return to her full-time position. When asked when she was physically able to return to work full-time, plaintiff stated that "[i]t never happened." (Johnson Dep. at 138-40.) Further, plaintiff stated that, though her symptoms have diminished since taking leave, they intensify when she is confronted with specific memories of confrontations with her supervisors. It is well settled that under the FMLA an employee must be able to return to her original position without accommodation after her medical leave. See Rinehimer v. Cemcolift, Inc., 292 F.3d 375 (3d Cir. 2002); Lombardo v. Air Prods. and Chems. Inc., No. 05-1120, 2006 WL 1892677 (E.D. Pa. July 7, 2006) (citing Fogleman v. Greater Hazleton Health Alliance, 122 Fed.Appx. 581 (3d Cir.2004)).

While plaintiff's position at CCAC was a full-time position, plaintiff's condition did not prevent her from working part-time outside of CCAC. As noted above, plaintiff never requested intermittent leave or to return on a part-time basis. She received more than twenty-one weeks of leave, twelve of which were specifically designated as FMLA leave. At the end of twelve weeks of FMLA leave, plaintiff was required to return to her CCAC full-time position or its equivalent. As plaintiff was not able to do so even at the time of her deposition of May 23, 2006, a reasonable jury could not find that plaintiff was prejudiced with respect to her claim of interference. A reasonable jury could not render a verdict in favor of plaintiff on her FMLA claims. Summary judgment must be granted in favor of CCAC with respect to plaintiff's

interference claims under the FMLA.

## V. ADA Claim

### A. Failure to Accommodate

To establish a prima facie claim for failure to accommodate under the ADA, a plaintiff must show that (1) she had disability; (2) defendant had notice of her disability; (3) she could perform the essential functions of her position with reasonable accommodation; and (4) the defendant failed to provide her with a reasonable accommodation. Lewis v. Pennsylvania, No. 06-1162, 2007 WL 1247076, *5 (W.D. Pa. Apr. 5, 2007). Plaintiff must provide evidence that she was substantially limited in one or more major life activities. See 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(j); see also Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 782-83 (3d Cir. 1998) (noting that determination of disability under the ADA requires an individualized assessment of impact on major life activities). Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i). Thinking and concentrating have also been held to constitute major life activities. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir.1999).

An individual is substantially limited if she is unable to perform, or is "significantly restricted as to the condition, manner or duration under which [she] can perform," a major life activity. 29 C.F.R. § 1630.2(j); see Sterling v. McKesson Automation, Inc., No. 04-1470,

2006 WL 2792203, *6 (W.D. Pa. Sept 26, 2006); <u>Sever v. Henderson</u>, 381 F.Supp.2d 405, 413

(M.D.Pa. 2005);  Factors to be considered under this standard include:

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j).  "[A]n individual must have an impairment that prevents or

severely restricts the individual from doing activities that are of central importance to most

people's daily lives.  The impairment's impact must also be permanent or long term." <u>Toyota</u>

<u>Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 198 (2002).

Plaintiff alleges that her prolonged stress disorder, which manifests as a bladder control

issue, elevated blood pressure, skin irritation, and anxiety, constitutes a disability under the ADA

and that CCAC refused to accommodate her properly by granting an extended leave.  CCAC, in

turn, contends that plaintiff was not disabled and that an "indefinite leave" was not a reasonable

accommodation.

### 1. Plaintiff's Condition as a "Disability" - Working as a Major Life Activity

The definition provided by the ADA of a "disability" is an impairment that "substantially

limits one or more of the major life activities."  42 U.S.C. § 12102(2).  A substantial limitation in

working requires a showing that the person is

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable

training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999) (citing 29 C.F.R. § 1630.2(j)(3)(i));

see Aldrup v. Caldera, 274 F.3d 282, 286-87 (5th Cir. 2001) (depression caused by "the

stress and anxiety of having to work with certain employees" merely shows an inability

to work at one specific location, and is not evidence of a general inability to perform a class of

jobs).

Here, plaintiff acknowledged that the only life activity limited by her condition is not

simply the ability to work, but specifically the ability to work at CCAC. (Johnson Dep. at 135,

141.) Even with her condition, plaintiff was able to retain her part-time employment as an

online instructor for the University of Phoenix and as minister of music for her church. Further,

plaintiff provides no evidence that she would be unable to perform the duties of the director of

contracts and grants, without accommodations, at another college or university. Most

importantly, when asked directly if any other major life activities or events were affected by her

condition other than the ability to work at CCAC, plaintiff said "no." (Johnson Dep. at

141.) This court cannot conclude that the ability to work at CCAC constitutes a major life

activity, the impairment of which is necessary for plaintiff's condition to be deemed a disability.

The court finds that no reasonable finder of fact could conclude that plaintiff's inability to work

at CCAC constitutes a disability under the ADA.

**2. Plaintiff's Condition as a "Disability" - Body Waste Elimination as a Major Life Activity**

In plaintiff's amended brief in opposition to defendants' motion for summary judgment, plaintiff, for the first time, contends that her bladder condition constitutes a disability under the ADA. She claims that she was "impaired by a dysfunctional bladder," the consequence of which was "an embarrassing non volitional impact on normal toileting and body waste processing." Pl's. Brief at 19. As noted above, raising new issues for the first time at this stage in the proceedings is improper. With respect to the issue whether the plaintiff has been substantially limited with respect to regular "toileting," which the court addresses *arguendo*, the court finds that it does not.

While the ADA does not define "substantially limits," the Supreme Court has provided some guidance in Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. at 194-97. The EEOC defines a substantial limitation as (1) the inability to perform a major life activity that the average person in the general population can perform; or (2) being significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1). The Court in Toyota reiterated that the EEOC did not have the authority to issue regulations interpreting the term "disability" in the ADA and that the persuasive authority of any such

82

regulations is not clear.  Toyota, 534 U.S. at 194 (citing Sutton, 527 U.S. at 479-80).  The Court

determined that the ADA term "substantial limitation" "need[s] to be interpreted strictly to

create a demanding standard for qualifying as  disabled."  Id. at 197.  This determination was

required by the legislative findings that

> "some  43,000,000 Americans have one or more physical or mental
> disabilities". . .  If Congress intended everyone with a physical impairment
> that precluded the performance of some isolated, unimportant, or
> particularly difficult manual task to qualify as disabled, the number of
> disabled Americans would surely have been much higher.

Id. (quoting 42 U.S.C. § 12101(a)(1) (citation omitted).

Plaintiff relies on Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378 (3d Cir. 2004).  In

Fiscus, the plaintiff suffered from incurable kidney failure, which required her to use dialysis to

cleanse her blood and process waste.  Id. at 380.  The plaintiff claimed that she was limited in

the major life activities of cleansing her blood and processing waste.  Id. at 382.  The court of

appeals held that the elimination of waste from the blood constituted a major life activity under

the ADA.  Id. at 385.  In reaching that conclusion, the court noted the Court of Appeals for the

Sixth Circuit's decision in Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999), which

held that waste elimination and controlling one's bowels can be a major life activity.  Fiscus, 385

F.3d at 384.

Assuming, therefore, that body waste elimination is a major life activity, plaintiff has not

shown that she is significantly limited in performing that function.  While plaintiff's August

2004 report to her urologist showed serious bladder problems at that time, there is nothing in the record about the extent to which those symptoms have continued or diminished. In very general terms, plaintiff stated that her condition has diminished, yet peaks when confronted with the issues of this case. Plaintiff's condition had improved by January 2005 when she was able to attend a deposition in an unrelated matter. There is insufficient evidence to conclude that Johnson's major life activity of bodily waste elimination was permanent, long-term, or extremely limiting. On this record, no reasonable jury could conclude that she is disabled by the impairment to her major life activity of bodily waste elimination.

Additionally, defendants contend that a condition that causes frequent bathroom use does not substantially limit one's body waste elimination, citing Sacay v. Research Found. of the City Univ. of New York, 193 F.Supp.2d 611, 629 (E.D.N.Y 2002) (colitis not a disability because "merely needing to be near a bathroom is not a substantial limitation that rises to the level of severity, frequency and duration required for a finding of a disability under the ADA"); Ryan v. Grae & Rybicki, 135 F.3d 867 (2d Cir. 1998) (colitis not a disability where the plaintiff was asymptomatic for long periods meaning duration and long term impact of condition favored a finding of no substantial limitation) Martin v. AT&T Corporation, 331 F.Supp.2d 1274, 1299 (D.Colo. 2004) (wearing protection and frequent use of the bathroom due to incontinence are not substantial limitations under the ADA). This court agrees that, when considering the meaning of the term "substantially limited," that no reasonable jury could find that plaintiff was substantially

limited in the elimination of body waste.  Therefore, the court concludes that no reasonable jury

could find that plaintiff's condition is a disability under this alternative theory of an affected

major life activity.  Under these circumstances, defendants had no requirement to accommodate

plaintiff's condition.  Summary judgment must be granted in favor of defendants on this ADA

non-accommodation claim.

**B. Failure to Engage in an Interactive Process**

In addition to her non-accommodation claim, plaintiff argues that defendant violated the

ADA by failing to engage in an interactive process.  In order to demonstrate that an employer

violated its duty to engage in the interactive process, the employee must show the following four

factors: (1) the employer knew about the employee's disability; (2) the employee requested

accommodations or assistance for his or her disability; (3) the employer did not make a good

faith effort to assist the employee in seeking accommodations; and (4) the employee could have

been reasonably accommodated but for the employer's lack of good faith.  Conneen v. MBNA

America Bank, N.A., 334 F.3d 318, 330 (3d Cir. 2003);   Taylor v. Phoenexville School Dist.,

184 F.3d 296, 314, 319-20 (3d Cir. 1999). By reason of the previous determination that no

reasonable jury could find that plaintiff is disabled under the ADA, this claim also fails.

Broussard v. Univ. of California, 192 F.3d 1252, 1259 (9th Cir.1999) (cited in Donahue v.

Consolidated Rail Corp., 224 F.3d 226, 234 (3d Cir.2000) ("Any failure by the University to

engage in an interactive process with Broussard is negated by the fact that she is not disabled

under the terms of the ADA.").

Even if plaintiff was deemed to have a disability, her only requested accommodation was for an extended leave, which is not a reasonable accommodation under the ADA. In order for leave to be considered a reasonable accommodation, leave time must enable the employee to perform his or her essential job functions *in the near future*. Dogmantis, 413 F.Supp.2d at 460 (citing Conoshenti, 364 F.3d at 151) (emphasis in original). "The weight of authority in the Third Circuit, as well as other Circuits, clearly establishes that a leave of absence for an indefinite duration is not a reasonable accommodation." Id. (citing Fogleman v. Greater Hazleton Health Alliance, 122 Fed. Appx. 581, 585 (3d Cir.2004); Peter v. Lincoln Technical Inst., 255 F.Supp.2d 417, 437 (E.D. Pa. 2002)).

Plaintiff requested an extended leave in anticipation of a medical evaluation. There is no evidence of record that the results of any forthcoming medical evaluation would be certain or predictable. Under those circumstances, no reasonable jury could find that plaintiff would have been able to perform her essential job functions "in the near future." This uncertainty is exacerbated by plaintiff's admission that she never felt physically able to return to her job, causing there to be an indefinite time frame for her requested leave.

> [I]t can be inferred that merely showing that an employer has failed to engage in the interactive process is not sufficient to recover under the ADA for a failure to make a reasonable accommodation claim, although it might bear on the proof of such a claim. Instead, with respect to an individual claim of failure to make a reasonable

accommodation, a plaintiff must additionally show that a reasonable accommodation was possible.

Hohider v. United Parcel Service, Inc., 243 F.R.D. 147, 191 (W.D.Pa. 2007)  Plaintiff contends

that CCAC had previously allowed her to work part-time when returning from workers'

compensation leave and that she could work part-time when near readily accessible bathrooms,

evidencing that reasonable accommodations were available.  Plaintiff, however, admits that she

never asked to return to work part-time, an option that was readily available to her during the

duration of her FMLA leave in the form of intermittent FMLA leave.  Plaintiff argued that

the bathrooms were not located near her office and the only bathroom on the floor had only two

stalls and was shared with students.  The bathroom situation is an element that plaintiff lays out

to contend that she was unable to return to work full-time at CCAC while continuing to be able

to work both of her part-time jobs.  While the accommodation of part-time work was available to

plaintiff but never requested, the accommodation of working part-time near a readily accessible

bathroom was shown *by plaintiff* to be unavailable and therefore unreasonable.

Inasmuch as the request for an extended leave was a request for an unreasonable

accommodation, CCAC was not obligated to grant plaintiff an extension.  With respect to an

interactive process to evaluate any alternative accommodations, CCAC was not required to

engage in a process to determine any accommodation, because no reasonable jury could find that

plaintiff's condition was a disability under the ADA.  Under these circumstances, summary

judgment must be granted in favor of CCAC with respect to plaintiff's ADA claims.

## VI. First Amendment Retaliation Claim

Plaintiff claims defendants violated 42 U.S.C. § 1983 by retaliating against her for exercising her right to free speech by way of her involvement with the Black Caucus. "Section 1983 imposes civil liability upon any person who, while acting under color of state law, deprives another individual of rights, privileges and immunities secured by the Constitution or federal law." Corey v. Nassan, 2006 WL 2773465 (W.D. Pa., 2006) (citing Doe v. Delie, 257 F.3d 309, 314 (3d Cir. 2004)). Section 1983 "does not create any new substantive rights, but it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere." Id.

To prevail on a retaliation claim brought pursuant to section 1983, plaintiff must show that (1) the defendant or defendants acted under color of law; and (2) their actions deprived the plaintiff of rights secured by the Constitution or federal statutes. Id. (citing Anderson v. Davalia, 125 F.3d 148, 159 (3d Cir. 1997)). As CCAC is a state-funded institution, the involvement of its agents, the individually named defendants, in the alleged violations of plaintiff's rights under section 1983 makes it undisputed that defendants acted under color of state law. Only the second element of a section 1983 claim is at issue here and the court must determine whether defendants retaliated against plaintiff for her exercise of her right to free expression as guaranteed by the First Amendment.

In order to determine whether a prima facie case of retaliation for exercising First

Amendment rights has been shown, it is well established that a plaintiff's claim is subject to a three-step analysis.  Ambrose v. Township of Robinson, Pa., 303 F.3d. 488, 493 (3d Cir. 2002) (citing Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 675 (1996)).  First, a plaintiff must show that her activity was protected by the Constitution.  Id.  Next, she must show that her activity was "a substantial or motivating factor in the alleged retaliatory action."  Id.  Finally, the defendant may defeat the claim by showing that it would have taken the same action had the plaintiff not conducted the activity.  Id.  The court in Ambrose found it "intuitive" that to find that the protected activity was a substantial or motivating factor, the decision makers "must be aware of the protected conduct."  Id.

There is no dispute that plaintiff's rights to free speech and free association are protected by the Constitution.  Plaintiff is protected by the First Amendment in her right to belong to an organization such as the Black Caucus and her right to voice complaints, as a member of that group, with respect to issues of hiring practices.  With respect to whether the voicing of concerns by the Black Caucus on matters of racial discrimination in CCAC's hiring practices constitutes protected speech, the court must "first determine whether the speech can be fairly characterized as constituting speech on a matter of public concern."  San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir.1994) (citing Connick v. Myers, 461 U.S. 138, 147 (1983)).  For purposes of summary judgment, the court will assume that concerns about racial discrimination in the hiring and advancement practices of a state-funded college rise to the level of speech on a matter of public

concern, and thus constitute protected speech.

With respect to the second element, however, plaintiff did not adduce any evidence that her involvement with the Black Caucus was a substantial or motivating factor in any of the alleged adverse actions taken toward her.  Plaintiff testified that she has no evidence that the individual defendants knew, prior to the filing of this suit, that she was a member of or associated with the Black Caucus.  Each of the individual defendants filed an  affidavit stating that he or she was not aware of plaintiff's involvement in the Black Caucus and plaintiff's allegations in support of  her claim amounts to mere suspicions or conjecture.  Plaintiff merely asserts various incidents in which the defendants may have had an opportunity to learn that plaintiff was a member of the Black Caucus, but did not adduce any evidence creating an inference that her involvement was in fact known to any of the individual defendants.

In particular, plaintiff argues that the following inferences are sufficient to support her claim:  an email to all CCAC staff, including Shader, from the Black Caucus, but plaintiff cannot recall whether the names of the members were included, nor is she certain that Shader read that email; a Middle States report, with which Shader was involved in the preparation, but plaintiff cannot confirm the report contained the names of members of the Black Caucus; a conversation in passing with Burzachechi during which plaintiff mentioned a "caucus meeting"; Burzachechi having access to plaintiff's email, which contained a message between plaintiff and Sutin that specifically mentioned the Black Caucus, but plaintiff cannot be certain that

Burzachechi read that email; Blocksidge having access to plaintiff's Outlook calendar which contained references to Black Caucus activities, but plaintiff cannot be certain that Blocksidge viewed the calendar; and plaintiff's presence at a meeting where Sutin announced the suspension of the search for the interim vice president, due in part to concerns voiced by the Black Caucus, but plaintiff admits that her presence at the meeting was with respect to the FIPSE grant.

Plaintiff states that she believes that the individual defendants had knowledge of her protected activity relating to her statements made as a member of the Black Caucus. She did not, however, adduce probative evidence to support her belief that they had knowledge of her membership in the Black Caucus or of the statements she made as a member. Plaintiff disputes the denials by the individual defendants that they had knowledge of the protected activity by referring to her feelings and beliefs which are subjective. Celotex, 477 U.S. at 322-23. Under those circumstances, no reasonable jury could find that the individual defendants had knowledge of her protected activity. Plaintiff did not adduce sufficient evidence to show that defendants violated her First Amendment rights, in violation of 42 U.S.C. § 1983 by retaliating against her for statements made by her or the Black Caucus or for her involvement with the Black Caucus.

Plaintiff alleges in her opposition brief that it is irrelevant whether defendants knew of her involvement in the Black Caucus because it could be inferred that they knew of her opposition to discriminatory practices. The claim raised in plaintiff's complaint, however, is that it was her involvement with the Black Caucus and the actions taken by the Black Caucus

toward addressing hiring practices at CCAC which were the motivating factors in the allegedly

retaliatory actions.  The only evidence plaintiff can show that defendants were aware of any

complaints of racial discrimination by plaintiff is the letter dated August 17, 2004 in which

plaintiff informed CCAC that she would be on leave, at the instruction of her doctor, due to

stress stemming from racial discrimination at work.  On the record before the court, plaintiff did

not establish a causal connection between any of the adverse actions taken against her prior to

August 17, 2004 and her opposition to racial discrimination. See Overall v. Univ. of Pa., 412

F.3d 492, 499 (3d Cir.2005) ("Dr. Overall engaged in protected activity when she filed

her grievance...on November 15, 2000. But the main adverse employment action on which she

relies...occurred on October 23-three weeks *before* she filed her University grievance...Since she

cannot prove a causal connection...her retaliation claim must fail.") (emphasis in original);

Maslanka v. Johnson & Johnson, Inc., No. 04-CV-5477, 2008 WL 918499, *2 n.4 (D.N.J. Mar.

31, 2008) ("Maslanka's claim that Fronius started writing negative evaluations of Maslanka in

February 2001 as a form of retaliation for going to the EEOC makes no sense, as there is no

evidence in the record that Maslanka contacted the EEOC prior to April 23, 2001.").

The only adverse action taken against plaintiff after August 17, 2004 was her termination

on January 18, 2005.  As discussed above, defendants may defeat a prima facie case of

retaliation by showing that the adverse action would have occurred had plaintiff not conducted

the protected activity.  Plaintiff did not adduce evidence of a discriminatory motive for her

termination.  CCAC's policy regarding FMLA leave clearly stated that "[e]mployees who fail to

return to work after FMLA leave shall be treated as having voluntarily terminated their

employment."  (Defs.' Ex. 77.)  When plaintiff failed to return to work at the conclusion of her

FMLA leave, CCAC followed its stated policy, of which plaintiff had been apprised, and treated

her as having voluntarily terminated her employment.  <u>Accord</u> <u>Sweis v. Hyatt Corp.</u>, No. 98

C7770, 2001 WL 619509, *4 (N.D. Ill. May 25, 2001) (The plaintiff did not return to work at the

conclusion of twelve weeks of FMLA leave and was terminated, but claimed termination was

retaliation for complaints of gender discrimination; court found that "[t]he fact that [the

defendants] fulfilled an obligation of their employment [by terminating an employee who did

not return to work following FMLA leave], without any evidence of discriminatory motive, does

not create a causal link between the complaint and the termination.").

Under the circumstances presented, the court concludes that no reasonable finder of fact

could render a verdict in favor of plaintiff on this claim.  Summary judgment must be granted in

favor of defendants with respect to plaintiff's First Amendment retaliation claim.

**VII.**    **Title VI Claim**

Section 601 of Title VI of the Civil Rights Act of 1964 prohibits discrimination by

federally funded programs. 42 U.S.C. § 2000d.  Section 601 provides:

> No person in the United States shall, on the ground of race, color, or national origin, be
> excluded from participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal financial assistance.

Id.  On its face, the administrative enforcement section appears to allow only agency action, but the United States Supreme Court has held that a private person also has a right to action.  See James S. ex rel. Thelma S. v. School Dist. of Philadelphia, No. 07-1778, 2008 WL 2357190, *17 (E.D.Pa. June 10, 2008) (citing Alexander v. Sandoval, 532 U.S. 275, 279 (2001) ("Title VI permits private individuals to bring suit to obtain both injunctive relief and damages.")).  Because a "program or activity" can include employment, Title VI appears to duplicate Title VII.  42 U.S.C. § 2000d-3; Maldonado v. City of Altus, 433 F.3d 1294, 1302 (10th Cir. 2006).  Section 604 of Title VI, 42 U.S.C. § 2000d-3,[15] however, limits claims relating to employment by requiring two factors be shown: 1) the "program or activity" must receive federal funding, and 2) the funding's primary purpose must be employment.  See Trageser v. Libbie Rehab. Ctr., Inc., 590 F.2d 87, 89 (4th Cir. 1978).  Section 604 of Title VI requires a logical nexus between the use of federal funds and the alleged discrimination.  Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 276 (2d Cir. 1981).  The parties do not dispute that CCAC receives federal funding.  The issue presented here is whether plaintiff adduced sufficient evidence to meet the second factor.

---

15  Section 604 provides:

> Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C.A. § 2000d-3.

With respect to the second factor, plaintiff argues that the primary purpose of the federal funding, i.e, the FIPSE grant, was to provide employment, thus satisfying the second factor required by Title VI. There is no record evidence, however, that supports plaintiff's position. Plaintiff argues that the purpose of FIPSE is to "recruit and educate women and minority [sic] in the electrical trades." Id. The only record evidence of that purpose is the title, "Globalizing Vocational Training Programs for the Electrical Industry to World Class Standards." (Johnson. Aff. Ex. 19.) The focus of the title is on training programs, i.e. *education*.

In Bhatt v. Uniontown Hospital, No. 83-2455, 1986 WL 30681, at *1 (W.D. Pa. Mar. 20, 1986), the plaintiff was a doctor who claimed that the defendant denied him staff privileges because of his race, color, and national origin. The plaintiff argued that the denial violated the Title VI because the hospital received federal funds in the form of Medicare and Medicaid payments. Id. at *3. The defendant argued the plaintiff could not assert a claim under Title VI because the federal funds were not aimed at employment. Id. at *5. The court commented on the threshold requirement for Title VI claims in an employment context :

> Thus, § 604 establishes a threshold requirement that must be met before a litigant can invoke the nondiscrimination provision of Title VI against a recipient of federal financial assistance in an employment discrimination context. Plaintiff must show that the primary purpose of the funding was to provide employment. The primary objective limitation has been interpreted to apply to employment discrimination suits under Title VI, whether brought by an individual plaintiff or by the government. Association Against Discrimination v. City of Bridgeport, [25 EPD ¶ 31,714] 647 F.2d 256, 276 (2nd Cir.1981), *cert. denied*, [28 EPD ¶ 32,465] 455 U.S. 988 (1982); cf. Chowdhury v. Reading Hospital & Medical Center, [29 EPD ¶ 32,697] 677 F.2d 317, 320 n. 9 (3d Cir.1982), *cert. denied*, [32 EPD ¶ 33,698] 463 U.S. 1229 (1983). ("Although Wilmington Medical Center held that

> intended beneficiaries of a federally funded program have a private cause of action for delcaratory [sic] and injunctive relief under Section 601, it is not clear whether the plaintiff here stands in the position of an intended beneficiary. We note that other circuits that have addressed the question of whether section 601 provides a cause of action for employment discrimination have required proof that the primary purpose of the funding was to provide employment.")

Id. The court agreed with the defendant's analysis and granted summary judgment, noting the lack of "correlation between a physician's request for staff privileges and the receipt by a hospital of [these federal funds]." Id. at *4. The recruitment and education of women and minorities proffered by plaintiff in this case as supporting the second element does not implicate employment as the primary purpose of the federal funding. Plaintiff's description of the grant itself contains the word "education," which is telling: the primary goal of the FIPSE grant was to educate-not to employ.

In Burks v. City of Philadelphia, 950 F.Supp. 678 (E.D. Pa. 1997), the plaintiffs were African-Americans who worked under a Caucasian male supervisor at the City's AIDS Activities Coordinating Office, a federally-funded organization. Id. at 681. The plaintiffs alleged that their Caucasian supervisor intentionally sabotaged their careers by preventing them from advancing to higher positions. Id. The plaintiffs argued that the defendants' actions adversely affected the intended beneficiaries of the federal funds (minorities) by refusing to fill job vacancies with minorities, thus violating Title VI. Id. at 682. The defendants moved for summary judgment because the organization's funds were not intended for employment

purposes.  Id. at 681-82.  The court found that the purpose of the federal funds was to educate the public about AIDS prevention, not to provide employment.  Id. at 683 n.4, 684.  When rendering summary judgment in favor of the defendants on the Title VI claim, the court stated: "[Plaintiffs] do not contend that a primary purpose of the [federal] funds is to provide employment.  Therefore, they cannot state a claim under [Title VI]."  Id. at 683.

The United States Court of Appeals for the Second Circuit dealt with Title VI claims in Bridgeport, 647 F.2d at 260.  In Bridgeport, the plaintiff filed suit on behalf of local African-American and Hispanic firefighter applicants.  Id. at 259.  The plaintiff alleged that the city's entrance exam violated Title VI because its requirements unfairly favored whites over minorities.  Id. at 260.  The defendants conceded that the city received the requisite federal funding, but argued that the funds were used primarily for public safety not for employment purposes.  Therefore, Title VI could not be violated.  Id. at 275.  Because the legislative intent indicated that the primary purpose must be employment and that was not shown by the

plaintiff, the court found that there was no violation of Title VI.  Id. at 275-76.[16]

On the record before the court, plaintiff did not adduce sufficient evidence for a reasonable jury to conclude that the primary purpose of the federal funding was employment. To the contrary, the evidence of the record is that the primary purpose of CCAC's federal funding was education – not employment.  Based upon the undisputed evidence of record, viewing all disputed facts in favor of plaintiff and drawing all reasonable inferences in favor of plaintiff, the court concludes that a reasonable jury could not render a verdict for plaintiff with respect to this claim.

## VIII.   Qualified Immunity Defense

With respect to plaintiff's section 1983 claim, defendants assert the defense of qualified immunity.  Government officials performing discretionary functions are shielded from suit by the defense of qualified immunity to the extent that "their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  Anderson v.

---

16  In Johnson v. County of Nassau, 411 F.Supp.2d 171 (E.D.N.Y. 2006), the district court followed an even narrower approach .  There, the plaintiff was an African-American male who worked in a medical center's office of diversity.  The purpose of that office was to deal with employees' discrimination claims.  Id. at 174.  The medical center received federal funds.  Id. at 176.  The plaintiff alleged that the defendants discouraged his office from raising any discrimination claims and demoted him several times when he complained, thus violating Title VI.  Id. at 173.  The defendants acknowledged the receipt of federal funding, but noted that there was not a "logical nexus" between the funds and employment.  Id. at 174-76.  The court agreed with the defendants and stated that the federal funds must be "aimed primarily at funding *plaintiff's* position."  Id. at 177 (emphasis added).  Because the evidence showed that federal funds were aimed at program maintenance, not the plaintiff's employment, the court dismissed the plaintiff's Title VI claim.  Id. at 176-77.

Creighton, 483 U.S. 635, 638 (1987). "To determine whether an official has lost his or her qualified immunity, we must first 'decide 'whether a constitutional right would have been violated on the facts alleged.''" McKee v. Hart, 436 F.3d 165, 169 (3d Cir. 2006) (quoting Doe v. Groody, 361 F.3d 232, 237 (3d Cir. 2004)) (quoting Saucier v. Katz, 533 U.S. 194, 200 (2001)). If the court answers this question in the affirmative, the court must then "consider whether the right was clearly established." McKee, 436 F.3d at 169 (quoting Saucier, 533 U.S. at 201). If the court answers yes to both questions, then the defendants are not entitled to qualified immunity. See Id., 436 F.3d at 169. In the present case, the record does not reflect that defendants violated any constitutional rights of plaintiff. Since no constitutional violations are supported by the record, the court need not decide whether the individual defendants who are administrators at a community college are entitled to qualified immunity.

### Conclusion

After viewing the undisputed material facts of record and any disputed facts of record in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of plaintiff, the court determines that defendant's motion for summary judgment shall be granted with respect to plaintiff's claims asserted under Title VII, sections 1981 and 1983 and the PHRA for hostile work environment, race and gender discrimination (except with respect to CCAC's failure to promote plaintiff to vice president) and retaliation, and with respect to plaintiff's claims under Title VI, the FMLA, and the ADA. With respect to plaintiff's claims against

CCAC for gender discrimination under Title VII and the PHRA, relating to CCAC's failure to

promote plaintiff to vice president, summary judgment is denied.

By the court,

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Court

DATED: July 10, 2008